THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CHARLES B. HUNTLEY, Appellant.

Fourth Department, July 9, 1982

APPEARANCES OF COUNSEL

*Gerald T. Barth* (*Eric Alderman* of counsel), for appellant.

*Richard Hennessy* (*John Cirando* of counsel), for respondent.

OPINION OF THE COURT

DENMAN, J.

█ Two days after a jury found defendant guilty of manslaughter in the second degree for the stabbing death of Leroy ("Troy") Simmons, a juror came forward with the information that during the course of their deliberations, one of the jurors informed the others that, contrary to the instructions of the court, he had gone to the scene of the crime. He described conditions with respect to the width of the street; gave an opinion as to whether vehicles could be parked on either side of the street; commented on one of the chief prosecution witness' ability to view the incident from a window overlooking the scene and stated that in his opinion she would have had a very good view. Such misconduct on the part of the juror, resulting in the jury considering matters outside the record, deprived defendant of due process and requires that the verdict be set aside and that he be granted a new trial.

Defendant was indicted for murder in the second degree; felony murder; manslaughter in the first degree; attempted robbery in the first degree; attempted robbery in the third degree and criminal possession of a weapon in the fourth degree. Prior to submitting the case to the jury, the court dismissed all counts except for the intentional murder and manslaughter charges. The events from which these charges arose were as follows. On the night of January 5, 1979 David Garceau, a witness for the prosecution, encountered the defendant Charles Huntley, whom he had known for some time, at the Blue Chateau, a bar on Oswego Street in Syracuse. "Troy" Simmons, the victim, arrived shortly thereafter and joined the other two men, both of whom he knew. During the course of the evening the three men left the Blue Chateau on a couple of occasions, walking down Oswego Street and stopping in other bars, but returned to the Blue Chateau. At some point Simmons and defendant engaged in a fight in the street outside the Blue Chateau as a result of which Simmons was stabbed to death. The testimony at trial presented three different versions of the fight and the events immediately preceding it:

## David Garceau's Testimony

Garceau testified that he, Huntley and Simmons left the Blue Chateau and walked down Oswego Street to look for someone, then returned to the Blue Chateau. Garceau sat at one end of the bar and Huntley and Simmons at the other. Huntley left the bar and soon after Garceau and Simmons went to the Club House, a bar across the street, and had another drink. As they left the Club House to return to the Blue Chateau, Huntley appeared and grabbed Simmons around the neck from behind and said, "Troy where's my money?", to which Simmons replied, "I have it". The two men began fighting and fell against a parked car. Simmons got up and ran into the street pursued by the defendant and they continued struggling across the street and into a snowbank. When Simmons yelled to Garceau to get the knife, Garceau crossed the street, saw Huntley lying beneath Simmons with the knife in his hand and removed the knife from Huntley's hand. Simmons had blood coming from his mouth and stated "I am dying". When asked who stabbed him, the victim replied "Charles".

## Sharon Lyons' Testimony

Sharon Lyons lived on the corner of Seymour and Oswego Streets in an apartment over the Club House bar directly across from the Blue Chateau. She knew all three participants in the struggle. On the evening in question she heard someone hollering and looked out to see defendant and Simmons fighting outside the Blue Chateau. Their struggle took them from the sidewalk outside the Blue Chateau across the street to a point almost underneath her window. Garceau came out of the Blue Chateau after Huntley and Simmons started fighting and she heard Simmons say, "He stabbed me," and ask someone to help him because he was dying. She saw Garceau walk away with a knife in his hand and attempt to put it in a trash can when Huntley came up, took the knife and walked away. She said that Garceau came out of the bar after Simmons had hollered, "He stabbed me," and that only Huntley was with Simmons at that time. She stated further that when the men had crossed to her side of the street Simmons was

hanging on to the defendant but then fell to the ground doubled over and that defendant had kicked him.

## Charles Huntley's Testimony

Huntley testified that as he walked back towards the Blue Chateau, Simmons approached him with a knife in his hand and said, "Give me your money." They began to wrestle and fell to the ground. When Huntley broke away Simmons pursued him with the knife. Huntley ran into a parked car on the opposite side of the street. Simmons caught up with him and, struggling, they fell to the ground. During this struggle Huntley got the knife away from Simmons but it inadvertently went into Simmons' back. When Garceau came over Simmons said "Take the knife", and Garceau removed it from Simmons' back.

Given the critical differences in the testimony, the credibility of Sharon Lyons' testimony and the accuracy of her observations were extremely significant. As a consequence, the statements of the juror to the effect that the street was narrow and that the witness would have had a very good view of the incident undeniably had the effect of bolstering her testimony. Conversely, the juror's comments that the street was not wide enough to accommodate vehicles parked on either side tended to undercut the credibility of the defendant.

When the information regarding the juror's statements during deliberations was made known, defense counsel moved to set aside the verdict. The District Attorney obtained affidavits from the other jurors which substantiated the fact that these statements had been made and two of the jurors said that the statements had influenced their verdict. A hearing was held at which the offending juror was placed under oath. He denied that he had visited the scene, stating that he had reconstructed the scene from his recollection of the testimony and had said that he had gone to the scene only in jest. The trial court, expressing concern that the jury not be harassed or intimidated, refused to expand the hearing to allow for examination of the other jurors and denied the motion to set aside the verdict.

Although as a general principle a verdict may not be impeached by delving into the tenor of the jury's delibera-

tions (*People v De Lucia,* 20 NY2d 275) the rule has been established in New York that unauthorized juror visits to the situs of a crime and communication of observations founded thereon to other jurors violates a defendant's right to confrontation and cross-examination as guaranteed by the Sixth Amendment (*People v Brown,* 48 NY2d 388, 393; *People v Crimmins,* 26 NY2d 319, 323; *People v De Lucia,* 20 NY2d 275, 279, *supra*). The People argue that the rule is not applicable here because the offending juror testified that he did not actually visit the scene but only said that he had. Whether he actually made the visitation is immaterial. He stated that he had observed the scene and corroborated the testimony of Sharon Lyons. Thus, the prejudice arose from his purported observations whether they were based on his mental reconstruction of the testimony or on his actual viewing. The result is the same: the juror became an unsworn witness testifying to critical events without defendant being afforded the right of confrontation or cross-examination.

We recognize that the "mere fact of infiltration of some molecules of extra-record matter" (*United States ex rel. Owen v McMann,* 435 F2d 813, 818, cert den 402 US 906) does not compel reversal. It is the nature of the facts communicated which determine the likelihood of prejudice. Most certainly jurors are not precluded from drawing on their wisdom and experience and engaging in a free exchange of ideas and subjective opinions during the course of their deliberations. The strength and vitality of the jury system depends upon a sifting out of such ideas and opinions with the result, hopefully, that the end product is the closest proximation to fairness and truth that can be reached on the evidence before them. The point, however, is that such deliberations must take their content from the record facts before them, not from external facts brought into the jury room by a juror and thus not screened through the judicial process. When that occurs there is "such a probability that prejudice will result that [the verdict] is deemed inherently lacking in due process" (*Estes v Texas,* 381 US 532, 542-543). Because the information communicated to the jury here was of such nature, defendant was

deprived of his constitutional right to due process and must be granted a new trial.

■ A second ground for reversal lies in the court's refusal to charge, although specifically requested to do so, that justification is a defense to the lesser included offense of manslaughter in the second degree. When he delivered the charge to the jury, the trial court explained the law of intentional murder and explained the defense of justification with respect to that charge; explained the law of manslaughter in the first degree and the defense of justification with respect to that charge; explained the law of manslaughter in the second degree as a lesser included offense but omitted the defense of justification. When the jury retired, the court submitted to it a verdict form which provided for the jury's consideration of the defense of justification on the charges of murder and manslaughter in the first degree but not on manslaughter in the second degree.

The jury returned to the courtroom twice for further instructions. On the first occasion they requested that the testimony of Sharon Lyons be reread and that the portion of Garceau's testimony regarding the fighting in the street be reread. The Judge then gratuitously explained the charges of murder and manslaughter in the first degree and that the defense of justification was applicable to each. Explaining manslaughter in the second degree, he stated "but the defense of justification would satisfactorily cover the entire charge as far as you are concerned." The jury returned for reinstruction on the second occasion, sending a note which stated as follows: "In order to avoid being hung, we would like to determine whether self-defense is consistent with manslaughter second". The court reread the definition of manslaughter second, reread the definition of justification and reinstructed the jury on the forms of the verdict. Defense counsel requested the court to give a specific instruction inasmuch as it appeared that the jury was having a problem as to whether justification was applicable to manslaughter second. The court responded, "That is not; I say no. I refuse to charge justification in manslaughter in the second degree". When the jury came in with a verdict of guilty of manslaughter in the second

degree, defense counsel requested that the jury be polled with respect to whether or not they had found the defense of justification under counts one and/or two. The court refused that request.

Where the proof at trial raises the defense of justification, the defendant is entitled to such charge (*People v Torre,* 42 NY2d 1036), even where it may be inconsistent with other aspects of the defense (*People v Burnell,* 84 AD2d 566; *People v Burns,* 78 AD2d 1009; cf. *People v Frazier,* 86 AD2d 557). The testimony of the defendant, if believed by the jury, clearly supported a defense of justification and indeed the court charged it with respect to the first two counts. The court's failure to so charge with respect to manslaughter in the second degree, especially after the request by the jury and by defense counsel, constitutes reversible error.

There was additional error in the court's failure to charge that the defendant was entitled to the defense of justification if he had been confronted with an armed robbery. According to Huntley's version of the episode, Simmons had approached him with a knife and demanded his money. Further, Huntley testified that he broke away and ran across the street pursued by Simmons, still holding his knife, and that it was during the ensuing scuffle that the knife inadvertently went into Simmons. Thus, if the jury believed defendant's version of the event, it could have found that he was justified in using force to thwart an attempted armed robbery and the court's failure to provide that charge was reversible error (see Penal Law, § 35.15, subd 2, par [b]; *People v Flores,* 75 AD2d 649; *People v Davis,* 74 AD2d 607). A defendant is entitled, for purposes of the charge, to a view of the trial testimony in the light most favorable to him (*People v Steele,* 26 NY2d 526, 529). The error was critical and warrants reversal even in the absence of a request to charge or an exception taken at trial (see *People v Flores, supra; People v Davis, supra*).

On retrial of the defendant one other error should be avoided. The prosecutor was allowed to ask defendant whether he had attempted to purchase marihuana on the night in question. On defendant's objection the court stated "I am satisfied there was a good faith basis for the mari-

huana question"; however, there was no proof on which the court could have reached that conclusion. Although it is true that a defendant who chooses to testify may be cross-examined concerning any immoral or criminal act which has a bearing on his credibility, there must be a showing of good faith and a reasonable basis in fact for such question (*People v Duffy,* 36 NY2d 258, 262, cert den 423 US 861).

The judgment of conviction should be reversed and a new trial granted.

SIMONS, J. P., HANCOCK, JR., CALLAHAN and MOULE, JJ., concur.

Judgment unanimously reversed, on the law, and a new trial granted.