Chief Judge Wachtler
(dissenting). I vote to affirm the order of the Appellate Division dismissing the indictment. Although there are strong policy arguments which would suggest that a police officer should not be prosecuted for doing precisely what would be expected of him, I agree with the majority that the Grand Jury nevertheless would have had the right to indict this defendant upon legally sufficient evidence. However, because Grand Juries have been known to indict on less than legally sufficient evidence, our Criminal Procedure Law permits judicial review of their findings. In this case, meaningful judicial review requires dismissal.
On a challenge to the sufficiency of the evidence before the Grand Jury, the reviewing court must view the evidence presented in a light most favorable to the People (People v Warner-Lambert Co., 51 NY2d 295, 299, cert denied 450 US 1031). So viewed, such evidence is sufficient if, unexplained and uncontradicted, it would warrant conviction by a trial jury (People v Di Napoli, 66 NY2d 812, 815; People v Pelchat, 62 NY2d 97, 105). Here, the evidence presented to the Grand Jury would have supported an indictment for murder or manslaughter based on an intentional shooting (to which the defense of justification was interposed). However, the Grand Jury did not charge the defendant with those crimes. In my view, the indictment charging the defendant with a reckless shooting is a compromise with no support in the evidence.
I.
During the course of an eviction of an emotionally disturbed tenant, housing police had reason to call upon the Emergency Service Unit (ESU) of the New York City Police Department, an elite unit of volunteers specially selected and trained, whose duties include responding to all police situations involving emotionally disturbed persons (EDP’s). The two ESU officers who arrived were told that the tenant, Eleanor Bumpurs, was very large, usually armed with a knife, and could be cooking lye. The two officers attempted to persuade Mrs. Bumpurs to open her door, threatening to break her lock if she refused.
*504 When Mrs. Bumpurs refused to cooperate, the ESU officers told her they were going to punch out the cylinder of one of the locks on her door (Housing Authority personnel had a passkey to the other), but would not try to enter her apartment. Upon doing so and peering into the apartment, the officers noticed a hazy cloud or mist in the living room and smelled a strong odor which they believed could be lye or some other caustic liquid. The officers saw Mrs. Bumpurs standing directly behind the door, armed with a long knife. Their request that she drop the knife and open the door produced no response.
The ESU officers left to get more equipment from their truck and to radio for assistance. They returned with bullet proof vests, a plastic shield, and an "EDP bar” made of iron pipe, about seven feet long, with a U-shaped piece of iron at the end, which is used to pin the emotionally disturbed person against a wall or floor. The two then returned to the fourth floor apartment and again tried to convince Mrs. Bumpurs to put down the knife and open the door while they waited for reinforcements. They attached a rope to the doorknob, unlocked the second lock with the Housing Authority passkey, and swung the door open about six inches two or three times to see if Mrs. Bumpurs would throw any lye.
An ESU sergeant, as well as four ESU officers, one of whom was the defendant, a 19-year veteran of the police department who had earned 18 commendations and had spent 14 years on the ESU, responded. One of the original ESU officers on the scene informed three of the new arrivals who had proceeded to the apartment that Mrs. Bumpurs was an EDP with a history of lye throwing and that she was armed with a knife. A new arrival at the scene, Officer Adams, told Mrs. Bumpurs through the door that he wanted to make sure nobody would be hurt. She replied, "if somebody comes in, we will see who gets hurt”. Adams saw through the cylinder hole the mist in the living room and detected a chemical smell. The defendant, Officer Sullivan, who was not looking through the cylinder hole at the time, also noticed a smell which he believed to be an insecticide.
When he arrived, the sergeant determined the ESU officers would have to enter the apartment to subdue Mrs. Bumpurs. As the officers were discussing how to effect their entry, they noticed that Mrs. Bumpurs had moved to a stool near the window at the rear of the living room, where she sat with the *505 knife in her right hand. The sergeant decided that then was the time to move, because Mrs. Bumpurs was in clear view and in a location where the officers would have time to maneuver. All except the defendant put on gas masks or goggles, and it was determined that Officer Elter would enter first with the EDP bar, followed by Officers Adams and Tedeschi carrying plastic shields, and then the defendant, whom the sergeant had assigned to check and carry the shotgun which was always used on EDP calls and whose primary duty was to protect the three officers in front of him. The sergeant would stand behind the defendant, and the last officer would remain at the door in order to open it if the others had to make a quick exit.
While the officers present continued to implore Mrs. Bumpurs to drop her knife, Officer Elter moved across the living room with the EDP bar extended in front of him. Mrs. Bumpurs rose from her seat and approached him. As they came together, he placed the end of the EDP bar in her midsection, while she slashed and hacked at him and the bar with the knife. Officer Adams came to Elter’s left side and attempted to knock the knife out of Mrs. Bumpurs’s hand with his shield. At the same time, Elter lost his grip on the bar and Mrs. Bumpurs almost succeeded in knocking it onto the floor. Recovering, he again tried to pin her with the bar, but she pushed the bar down again and resumed stabbing at it with her knife. Officer Adams’s continuing efforts to disarm Mrs. Bumpurs with his shield were also unsuccessful. She suddenly turned on him and started stabbing at him over his shield, forcing him down on one knee with the shield over his head to protect himself. As Elter tried to displace Mrs. Bumpurs with the bar, she resumed her attack on him, causing him to lose his balance and fall forward as she extricated herself from behind the bar.
The defendant, who had been standing a few feet behind Officer Elter, stepped up to his right side and yelled several times at Mrs. Bumpurs to drop her knife. With the shotgun at his hip, he then fired two shots at her from a distance of approximately two feet. There was a considerable difference of opinion among the various witnesses before the Grand Jury on the interval between the two shots, the estimates ranging from less than a second to three to five seconds.
The officers present who could see what happened to Mrs. Bumpurs between the shots all testified that the first shot did *506 not stop her or cause her to drop the knife, and that she continued her attack until hit in the chest by the second shot. The defendant testified before the Grand Jury that he fired the first shot because he was in fear for Officer Elter’s life. As he had been trained, he aimed at Mrs. Bumpurs’s "center of mass”, or the center of her chest. Although nothing obstructed his view of her, he believed his first shot missed, "because it had no effect whatsoever” on her. After pumping another shell into the chamber and seeing that Mrs. Bumpurs still held the knife with which she continued slashing, he squeezed the trigger, firing a second shot into her chest. He estimated that the second shot followed the first by only one second, and did not see where it hit, though he did see Mrs. Bumpurs stop and then step into the kitchen, where she fell.
The knife blade and its shattered handle were found in the living room. Emergency Medical Service Technicians found Mrs. Bumpurs still alive on the kitchen floor, her right hand missing several fingers and bleeding profusely, and her upper right chest also bleeding. Despite her resistance and the difficulties caused by her size, first aid was administered and Mrs. Bumpurs was removed to the hospital, but efforts there to save her life failed.
The doctor who treated Mrs. Bumpurs at the hospital and the pathologist who performed the autopsy gave expert testimony before the Grand Jury. They both agreed that she had been hit by two shotgun blasts, and both agreed that the hand wound she suffered was so severe that it would have been impossible for her to hold onto the knife after being shot in the hand, though she could have still moved her arm and remained standing. The chest wound was the more severe, however, and it would have been difficult if not impossible for Mrs. Bumpurs to have remained standing after having been shot in the chest. Therefore, the treating physician concluded that the hand injury was caused by the first shot and the chest wound by the second.
II.
The decisive issue in this case is: If the evidence unequivocally establishes an intentional shooting and "that a complete defense such as justification may be present, [so that] the prosecutor must charge the grand jurors on that defense” (People v Goetz, 68 NY2d 96, 115), may the prosecutor "hedge” on the intentional charges by also instructing the Grand Jury *507 on a lesser offense based on reckless shooting, in the hope that the Grand Jury will reach a compromise verdict?
The People, in their brief to our court, concede that when the defendant and the other members of the ESU entered Mrs. Bumpurs’s apartment for the purpose of subduing, as humanely as possible, the knife-wielding, mentally unbalanced woman, they were met with a ferocious, life-threatening response. The People further concede the situation degenerated into one warranting strong police action to preserve the safety of two officers who had become vulnerable targets of her violent slashing. Indeed, the People state there is "no question at all as to whether defendant acted properly and with justification when he loosed the first shotgun blast at Mrs. Bumpurs.”
What the People do claim is that the Grand Jury could have found the second shot to have been unnecessary and that the defendant was or should have been aware of that fact because (a) the first shot disarmed the victim, (b) almost five seconds passed between the two shots and (c) the defendant’s vision, unlike that of the others present, was not obscured by goggles or mask.[1]
Penal Law § 125.15 (1), for violation of which the Grand Jury indicted the defendant, provides:
"A person is guilty of manslaughter in the second degree when:
"1. He recklessly causes the death of another person.”
In turn, Penal Law § 15.05 (3) provides: "3. 'Recklessly.’ A person acts recklessly with respect to a result or circumstance *508 described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation”.
Two higher charges, murder in the second degree and manslaughter in the first degree, were also submitted to the Grand Jury. Justification was charged as to all three offenses.[2]
The Grand Jury declined to indict the defendant with the two higher crimes. The murder charge was based on Penal Law § 125.25 (1), which provides in pertinent part that a person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person, he causes the death of such person”. The manslaughter charge was based on Penal Law § 125.20 (1), which provides in pertinent part that a person is guilty of manslaughter in the first degree when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person”. The evidence before the Grand Jury, including the defendant’s uncontradicted testimony, corroborated by all the attendant circumstances, that he intentionally fired his shotgun twice at his victim’s chest, would certainly have supported an indictment for either of these counts if the defendant’s actions were not justified.
In my view, however, the same conclusive evidence of intentional shooting negates any possibility that the defendant’s shooting of Mrs. Bumpurs was reckless. It may be useful to ask whether, if this defendant were indicted on charges of manslaughter in the first degree or murder in the second degree, both based on an intentional shooting, would he, on the evidence presented to the Grand Jury in this case, be entitled to a charge of manslaughter in the second degree as a lesser included offense? To be entitled to such charge, the defendant must show "that in all circumstances, not only in those presented in the particular case, it is impossible to commit the greater crime without concomitantly, by the same *509 conduct, committing the lesser offense. That established, the defendant must then show that there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater” (People v Glover, 57 NY2d 61, 63). Although it has been held that in the abstract it is impossible to commit murder in the second degree or manslaughter in the first degree without also committing reckless manslaughter (see, People v Green, 56 NY2d 427, 433, rearg denied 57 NY2d 775, and cases cited), it seems clear that in this case the second prong of the Green-Glover test would not have been met — that is, there is no reasonable view of the evidence that would support a finding that the defendant committed reckless manslaughter. What the evidence before the Grand Jury did show, as this court has noted in an analogous jury trial situation, is "that defendant was guilty of an intentional shooting or no other” (People v Wall, 29 NY2d 863, 864).
Indeed, the cases have consistently approved refusals to charge reckless manslaughter as a lesser included offense under similar circumstances. In People v Hartley (103 AD2d 935, 936, affd 65 NY2d 703), for example, the court held "that the wounds inflicted upon the victim were numerous, that they were inflicted by an axe, and that at least one of the blows to the head was inflicted after the victim lost consciousness, support a conclusion that defendant’s acts were neither reckless (Penal Law, § 125.15) nor negligent (Penal Law, § 125.10), but, rather, intentional in nature.” Similarly, it was held that no reasonable view of the evidence would support the submission of manslaughter in the second degree where the defendant’s own testimony, like that of the defendant at bar, "made plain that he intentionally shot at” his victim (People v Smith, 87 AD2d 640, 642; see also, People v Russo, 41 NY2d 1091, 1092, rearg denied 42 NY2d 974).
Each of the cases holding a defendant to have been entitled to a lesser included charge is easily distinguishable as having involved a hand-to-hand struggle between the defendant and his victim during which, the defendant claimed, he only attempted to repel the victim’s attack but somehow during the struggle recklessly inflicted fatal injury (see, e.g., People v Tai, 39 NY2d 894; People v Murray, 40 NY2d 327, rearg denied 40 NY2d 1080, cert denied 430 US 948).
The majority’s holding in this case will allow a District Attorney, in a case where the defendant admits an intentional *510 act (which admission is fully and unequivocally corroborated by the other evidence) and claims justification, to nullify the Grand Jury’s finding that the act was indeed justified as claimed by giving it the option of a compromise verdict.[3] The giving of such a choice in this case was not warranted by any reasonable view of the evidence; the indictment based upon it was therefore properly dismissed. In addition, the majority has vitiated the second prong of the Green test in that every defendant charged with murder in the second degree or manslaughter in the first degree will now be entitled at trial, upon request, to an instruction on reckless manslaughter as a lesser included offense, regardless of whether there is any support in the evidence for the lesser charge. In short, because the majority has broken with precedent for no justifiable policy reason, I dissent and vote to affirm the order of the Appellate Division.
Judges Meyer, Simons, Kaye, Alexander, Titone and Hancock, Jr., concur in Per Curiam opinion; Chief Judge Wachtler dissents and votes to affirm in a separate opinion.
Order reversed, etc.

. The majority holds that these facts, viewed in a light most favorable to the People, could have led the Grand Jury to conclude that the defendant merely wanted to prevent Mrs. Bumpurs’s menacing movements at his fellow officers and that, "in the tension and confusion”, defendant, aware of the grave risk created by firing a shotgun at Mrs. Bumpurs, "disregarded the danger to her * * * in favor of his concern with stopping her, regardless of the fact that he had five seconds to note that she no longer represented a lethal threat.” (Majority opn, p 502.) The conclusion posited is that such findings would establish the elements enumerated in the majority opinion of reckless manslaughter. Conspicuously absent from the enumerated elements, however, is the element of the statutory definition of recklessness that "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation” (Penal Law § 15.05 [3]). As the Appellate Division noted, even in the unlikely event the Grand Jury made the findings ascribed to it by the majority, the above-quoted element of recklessness would not be satisfied as a matter of law.

. Justification may be a defense to a crime requiring a criminal intent less than the specific intent required for the particular act (see generally, People v McManus, 67 NY2d 541, 547-548). This court has held specifically that justification may be asserted as a defense to reckless manslaughter in the first degree (Penal Law § 125.15 [1]) (see, e.g., People v Huntley, 59 NY2d 868, affg 87 AD2d 488).

. The prosecutor instructed the grand jurors that the defense of justification, if accepted by them, would exonerate the defendant of liability for all three crimes charged. The Grand Jury obviously ignored this instruction, the correctness of which is not a question before this court.