THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WALTER WHITE, Appellant.

First Department, January 3, 1991

APPEARANCES OF COUNSEL

*Rona Feinberg* of counsel *(Nikki Kowalski* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Mitchell Briskey* of counsel *(Paula Sharp* with him on the brief; *Philip L. Weinstein,* attorney), for appellant.

## OPINION OF THE COURT

KASSAL, J.

During the early morning hours of Saturday, January 29, 1987, a plastic garbage bag containing a badly decomposed body was discovered in an elevator at 425 West 25th Street in Manhattan, and the police were notified. Directed by residents of the building to apartment 7B, where it was believed that drugs were being sold, two detectives went to the 7th floor to investigate. While finding nothing suspicious in apartment 7B, the detectives were drawn to apartment 7A, from which a foul odor was emanating. The detectives knocked on the door of this apartment, where defendant lived with his wife and two stepdaughters, and defendant invited them to enter.

Despite the frigid January weather, all of the windows in the apartment were open, and defendant attributed this to his 17-year-old stepdaughter, Paula, having cleaned the apartment on the previous night. Paula, however, denied cleaning any part of the apartment except the bathroom, and said that

she had not touched the windows. Defendant told the detectives that she was lying, the same response he gave when Paula's six-year-old sister, Adrian, volunteered that the stench permeating the apartment was coming from a bag inside of the hall closet. Adrian opened the closet door to show the detectives, but the bag was no longer there.

When one of the detectives asked to speak with defendant's wife, defendant told him that she had not been home since she went to Bellevue Hospital to have a full-length cast removed from her leg a week earlier. Mrs. White's crutches were still in the apartment, however, and defendant explained that she was able to get around without them. As defendant discussed these various matters with the detectives, he moved freely around the apartment, getting dressed, cooking Adrian's breakfast, getting her ready for school, and using the bathroom. He consented to the detectives' looking around the apartment.

At approximately 10:00 A.M., defendant and his stepdaughters were asked to accompany Detective Michael Churchill to the 10th Precinct. Defendant was not under arrest, and had not been handcuffed, searched or frisked. At the precinct, defendant was neither accused of killing his wife nor threatened with arrest, and at one point went unescorted to a bathroom located near a stairwell leading out of the building. When offered something to eat, defendant accepted only water, saying that all he wanted was to assist in finding his wife.

In talks with detectives during the course of that morning, January 29, 1987, defendant told of several violent arguments between him and his wife, describing, for example, how he had wrested an iron pipe from her on New Year's Eve, and struck her in self-defense, breaking her leg. That argument was caused by Mrs. White's having brought home persons who stole cash, jewelry, and other items while Mr. White slept, and by her having told him, in coarse terms, of her latest infidelity.

On January 8, when the couple argued because defendant refused to purchase either liquor or marihuana for Mrs. White, she had him arrested for the previous week's assault. Released the following day, defendant returned to the home in violation of an order of protection, and informed Eric Jones, Mrs. White's son, that "someone would get hurt" if he had to go to jail.

At the precinct on January 29, after a search warrant, as

well as defendant's signed consent, had been obtained for the search of his apartment, defendant beckoned to Detective Churchill, who was conferring with other detectives, and volunteered to "tell [him] what really happened". In a statement providing an account which he would later give at trial, defendant told the detective that on the morning of Thursday, January 22, he awoke at 6:00 A.M. and prepared breakfast for himself and Adrian, and then took the child to school. As he was leaving, Mrs. White yelled out that she wanted him to bring back some "reefer" and a "bottle". Defendant further recounted how, upon returning to the apartment between 11:30 A.M. and 12:00 noon, Mrs. White was lying motionless and did not respond to his attempts to revive her. Defendant first told the detective that he had found his wife on the couch, but later said she was on the floor near the bathroom. When she continued to show no signs of life, defendant did not call the police or an ambulance. Instead he washed the body with a wet cloth, wrapped it in a bedspread, and put it in the closet. It remained there for one week, with defendant mopping up blood which seeped out from under the closet door.

Defendant's statement to Detective Churchill also told of how he obtained large garbage bags from the building handyman on January 24, placed the body into them the following day, and put it back into the closet. In the days that followed, defendant went about his usual daily routine, until January 29, when he dragged the decomposing body from the closet at 3:00 A.M. and put it into the elevator. He then went out, bought beer, and met with people he knew from the street. Upon returning at about 4:00 A.M. to a lobby filled with police officers, defendant paid no attention to what was going on, but went to his apartment, cooked and ate, and then slept until he was awakened by the police at about 6:00 A.M.

When defendant's statement was completed, Detective Churchill read it out loud, and defendant signed it after making and initialing a few corrections. During the time that defendant was giving his statement, the only officer present was Detective Churchill. Defendant had not been detained, arrested, handcuffed, placed in a cell, or accused of homicide.

At approximately 6:00 P.M., Detective Churchill received word from the Deputy Medical Examiner that Mrs. White's death had been caused by a stab wound to the neck, and it was then that defendant was placed under arrest. In a search incident to his arrest, the police recovered from defendant's

jacket pocket a steak knife, keys and a pawn ticket which, it was later learned, was for the deceased's rings.

Defendant's primary argument on appeal asserts that his precinct statements should have been suppressed. The critical question is whether the statements were elicited during custodial interrogation, which triggers the constitutional mandate that an accused be informed of his rights pursuant to *Miranda v Arizona* (384 US 436, 444; *People v Huffman,* 41 NY2d 29, 33). Custodial interrogation takes place when a reasonable person in defendant's circumstances, who is innocent of any crime, believes himself to be in custody. *(People v Centano,* 76 NY2d 837; *People v Yukl,* 25 NY2d 585, 589, *cert denied* 400 US 851.)* A suspect's awareness that the police may have incriminating evidence against him is generally irrelevant in determining whether the questioning is custodial; the critical consideration is whether he reasonably believes his freedom is significantly restricted. *(Matter of Kwok T.,* 43 NY2d 213, 219-220.)

The record before us fails to support any such reasonable belief. From the time of the initial police contact, which took place at defendant's apartment, defendant's movement was wholly unrestricted. He cooked breakfast, went to the bathroom, got dressed, and otherwise moved freely about his apartment. When he was requested, not ordered, to accompany detectives to the precinct, defendant, who had reported that his wife was missing, was not subjected to any force or physical restraint, but simply sat in the back seat of the police car with his stepdaughters. We also note that, in addition to the lack of physical restraint, defendant voluntarily accompanied the police to the precinct. *(See, People v Winchell,* 64 NY2d 826, 827; *People v Morales,* 42 NY2d 129, 137-138, *cert denied* 434 US 1018.)

Once at the precinct, defendant was permitted to move about and even went to the bathroom unescorted, despite a nearby staircase leading out of the building. Defendant was fully cooperative with the police, saying he "just wanted to help" and "find out what happened to [my] wife". When Detective Churchill left to obtain a search warrant for his apartment, no one guarded or detained the unhandcuffed defendant, and he was never told that he was not free to leave. *(See, People v Rodney P.,* 21 NY2d 1, 10-11.)* Finally, and perhaps most significantly, after the Deputy Medical Examiner adduced the cause of death to be a stab wound to the neck, and defendant was actually taken into custody, he was

frisked for the first time, and a steak knife was recovered from his pocket. We are in full agreement with the hearing court that it is "incredible" that a person in custody would be freely walking about a precinct with a weapon in his jacket pocket. Equally unlikely is the notion that a person who believed himself to be in custody, despite the fact that he was allowed to walk about the police precinct unescorted, would not have rid himself of a weapon.

For these reasons, defendant's first argument on appeal is unanimously rejected.

■ Defendant next argues, and has persuaded our dissenting colleagues, that the trial court erred in denying his request to charge the jury on the affirmative defense of extreme emotional disturbance. Although "a defendant's entitlement to a charge on a claimed defense is not defeated solely by reason of its inconsistency with some other defense raised or even with the defendant's outright denial that he was involved in the crime", the evidence must support the defense. *(People v Butts,* 72 NY2d 746, 748.) The affirmative defense of extreme emotional disturbance, which will reduce the crime of murder in the second degree to manslaughter in the first degree (Penal Law § 125.25 [1] [a]), requires that the defendant demonstrate, by a preponderance of the evidence: (1) that there exists an objectively reasonable explanation for his state of extreme emotional disturbance; and (2) that, subjectively viewed, defendant, in fact, acted under the influence of extreme emotional disturbance. *(People v Moye,* 66 NY2d 887, 890; *People v Casassa,* 49 NY2d 668, 678, *cert denied* 449 US 842.)

In the case at bar, an argument may be constructed with respect to the first prong, since there was evidence of Mrs. White's infidelities and, in particular, the New Year's Eve encounter to which she so crudely alluded upon returning home the morning of January 1, 1987. More problematic for defendant is the second prong, which requires that he establish, by a preponderance of the evidence, that he acted under extreme emotional disturbance when he stabbed her in the neck three weeks later. Although the Court of Appeals has recognized that extreme emotional disturbance may be present after a period of "simmering" *(see, People v Patterson,* 39 NY2d 288, 303, *affd* 432 US 197), the record before us reveals no such process of slow boil. Rather, a precipitous and violent altercation took place on New Year's Eve, with defendant

inflicting a serious—but not fatal—blow upon his wife. One week later, there was an argument because defendant refused to provide his wife with liquor or marihuana, and she had him arrested and charged with the January 1 assault. Another two weeks would elapse before defendant murdered her.

Contrary to the dissent's assertion that the majority would deem this interval a sufficient "cooling off" period "as a matter of law", we find only that the record does not contain a sufficient basis to support a claim that defendant's capacity was "diminished by mental trauma" and that his actions were "caused by a mental infirmity not arising to the level of insanity". *(People v Patterson, supra,* at 302, 303.) Although it is plausible that defendant may have been angry, and this emotion "might sometimes serve as the 'reasonable explanation' for the presence of 'extreme emotional disturbance' [it is] not equivalent to the loss of self-control generally associated with that defense, and * * * not necessarily indicative of the 'mental infirmity' " necessary to establish the defense. *(People v Walker,* 64 NY2d 741, 743; *People v Reeves,* 163 AD2d 590.)

In short, while defendant's denial that he killed his wife would not, of itself, foreclose application of the affirmative defense of extreme emotional disturbance, it served to deprive him of an opportunity to present evidence that he acted in such an emotional state, and resulted in a record which, absent speculation, is devoid of any basis for this affirmative defense. The evidence adduced by the People to establish his motive and intent—integral components of every criminal prosecution—did not supply defendant with this critical proof.

Accordingly, the judgment, Supreme Court, New York County (Harold Rothwax, J.), rendered July 27, 1987, convicting defendant, after a jury trial, of murder in the second degree (Penal Law § 125.25 [1]), and sentencing him to an indeterminate term of imprisonment of from 15 years to life, should be affirmed.

WALLACH, J. (dissenting). Entirely upon circumstantial evidence, defendant was convicted of the crime of murder in the second degree for the fatal stabbing of his wife. The prosecution buttressed its case with evidence that defendant was motivated to kill his wife out of rage at her infidelities and her other acts of psychological and physical cruelty towards him and two of her daughters still living at home. Yet, while

employing such evidence to convict the defendant of murder,[1] the People maintain, and the trial court and majority concur, that the same proof was properly not available to defendant to demonstrate that he "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." (Penal Law § 125.25 [1] [a].) We disagree and would grant a new trial.

This partial affirmative defense set up in the cited section of the Penal Law, which enables a defendant to reduce the grade of the homicide to the crime of manslaughter in the first degree, requires proof of two elements by a preponderance of the evidence. First, the explanation for the defendant's state of extreme emotional disturbance must be objectively reasonable *(People v Moye,* 66 NY2d 887, 890; *People v Casassa,* 49 NY2d 668, 679, *cert denied* 449 US 842). Second, subjectively considered, the evidence must demonstrate that the defendant acted under the influence of an extreme emotional disturbance. Psychiatric opinion is not necessary to sustain the defense *(People v Moye, supra,* at 890).

Less than five months before the death of his wife, Margaret, on January 22, 1987, this 55-year-old defendant moved into her apartment, and they were subsequently married on December 8, 1986. Almost from the outset of this short and tragic cohabitation defendant became aware that Margaret

---

1. For example, the prosecutor properly argued to the jury in summation: "On January 1st at 5:05 in the morning, she leaves her husband alone to go out to celebrate without him. She comes back and she admits to him that she's been unfaithful. And you will note that this is not the sort of admission that sometimes happens in a marriage where somebody comes back and says a horrible thing has happened. I had an affair. I feel terrible about it. I really love you. This was not the sort of contrite or apologetic cheating wife who did not look inexhaustibly, certainly better than what Mrs. White did. She rubbed his face in the dirt about it. And you will recall the words. And I don't say these words, or have any particular like of them. But they are in evidence. My pussy is dripping wet with being with that other man. Those were the words she used. That was the sort of marriage they had. She came at him with a pipe and either attempted to hit him or hit him, depending on which version of the evidence she believed. According to the defendant she bit the defendant with such force that it left a permanent scar. It is clear from all of this ladies and gentlemen, that this was a marriage which never should have been."

It may be noted that a taunt of sexual inadequacy may have explosive psychological force *(see, People v Moye,* 66 NY2d 887).

was a severe drug and alcohol abuser, maintaining relationships, inevitably suspicious to him, with four ex-boyfriends, and in his eyes was indulging in possible intimacies with other men. On occasion Margaret's infidelities invaded defendant's home, when an unknown paramour would steal defendant's cash, liquor, and perhaps his watch. This continuous marital and other misconduct culminated in a pitched battle between husband and wife on New Year's Eve when Margaret badly cut defendant's one usable hand, and he in turn fractured his wife's leg with a metal pipe. (The jury acquitted defendant of an assault charge submitted to it arising out of this episode.) A week later on January 8th, apparently angered by defendant's refusal to supply her with liquor and marihuana, Margaret brought about defendant's arrest for his assault on her, and he spent a night in jail. There was proof that this jailing greatly angered defendant.

After defendant "discovered" his wife's body in the apartment on January 22nd, his behavior was extremely bizarre. For the next week he kept the body in an apartment closet despite the increasingly rank odor, praying over it that "a miracle" of resuscitation might occur. Only on January 29 did he place the body, then decomposed almost beyond recognition, in the apartment elevator where, wrapped in an ordinary garbage bag, its discovery by the authorities was immediately inevitable.

The majority appear to conclude that the three-week lapse of time from the traumatic New Year's Eve battle, and the two-week interval between defendant's smouldering anger at his arrest and incarceration on January 8th, constituted a "cooling off" period sufficient to dismantle any extreme emotional disturbance which may have effected defendant on January 22nd *as a matter of law.* We cannot subscribe with total confidence to such a mechanistic model of the human mind, nor does the law. As was observed by the Court of Appeals in *People v Patterson* (39 NY2d 288, 303) under the present statute before us, it is no longer necessary that the killing be "under the heat of passion" to reduce the grade of the killing. Rather, "An action influenced by an extreme emotional disturbance is not one that is necessarily so spontaneously undertaken. Rather, it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore" *(supra,* at 303).

In a nutshell, a time lapse which would permit the infer-

ence of "cooling off" was no longer fatal to the mitigatory defense, as it was under the prior standard derived from common law *(see, People v Casassa,* 49 NY2d 668, 675, 676, *supra;* for the prior and now superseded rule, *see, People v Fiorentino,* 197 NY 560, 563). We therefore would hold that a fair jury question was presented which cannot be foreclosed to this defendant.

The trial court never reached the question of whether a reasonable view of the evidence would support submission of defendant's alleged extreme emotional disturbance to the jury. When defense counsel requested such a charge, the court took what we would consider the overly simplistic view that because defendant had taken the witness stand and testified, consistently with all his statements to the police, that he had nothing whatsoever to do with defendant's death, a charge pertaining to defendant's mental state was precluded by that circumstance alone.[2] The court ruled: "[T]here is no basis in this Court for me to charge manslaughter in the first degree; extreme emotional disturbance in the situation where the defendant not only did not testify that he acted under extreme emotional disturbance, but testified that he didn't act at all. That he didn't in any way cause the death. So you have an exception to that ruling."

This ruling was error under now prevailing law. As a general proposition a defendant in a criminal action is entitled to a charge pertaining to a defense even if that defense is inconsistent with his central litigational stance, provided that a reasonable view of the evidence would support that defense. In assessing that "reasonable view", the trial court must bear in mind that "defendant is entitled to the 'most favorable view of the record' " *(People v Steele,* 26 NY2d 526, 529, where it was error in an assault prosecution to refuse a justification charge that defendant shot the complainant in defense of his sister even though defendant denied any involvement and testified to an alibi). Similarly, in a murder prosecution, where defendant was convicted of manslaughter in the second degree, the defendant's main line of defense was that he stabbed the victim inadvertently in a scuffle, it was fundamental error calling for reversal, without any preservation of the point on appeal, for the court to refuse a justification charge to the

---

2. To be sure, that view has attracted its devoted adherents, particularly in the lower Federal courts prior to *Mathews v United States* (485 US 58 [1988]; see also the dissent of Justice White in *Mathews* in which Justice Blackmun joined). This case was tried in June 1987, prior to *Mathews.*

effect that the jury could find defendant was resisting an attempted armed robbery *(People v Huntley,* 87 AD2d 488, *affd* 59 NY2d 868; *see also, People v Padgett,* 60 NY2d 142).

Application of the affirmative defense of entrapment, ensconced in Penal Law § 40.05, may provide a useful analogy. It is now settled that availability of this plea to the accused is not dependent upon total confession before avoidance may be had, but that he may deny criminality in the tainted transaction, and nonetheless assert the defense *(Mathews v United States,* 485 US 58). By way of dictum this view has been adopted as the general law of New York in *People v Butts* (72 NY2d 746, 748-749), a drug sale case, as follows: "It is established New York case law that a *defendant's entitlement* to a charge *on a claimed defense is not defeated solely by reason of its inconsistency with some other defense* raised *or even with the defendant's outright denial that he was involved in the crime * * *.* We perceive no reason why this general rule should not also apply to the affirmative defense of entrapment * * *. Thus, we reject the rationale of the Appellate Division that defendant's testimony that he did not make the first three sales 'eliminate[d] any justification for an entrapment charge' ". (Emphasis added.)

In *Butts (supra),* however, the Court of Appeals held that a reasonable view of the evidence did not support the entrapment defense as a matter of law. Here, our perception of the record is directly to the contrary.

As a final note, we would agree with the majority that inasmuch as the police questioning of defendant was noncustodial, his statements at his home and at the police precinct station were properly received in evidence *(People v Centano,* 153 AD2d 494).

SULLIVAN, J. P., and ROSS, J., concur with KASSAL, J.; ROSENBERGER and WALLACH, JJ., dissent in a separate opinion by WALLACH, J.

Judgment, Supreme Court, New York County, rendered on July 27, 1987, affirmed.