11 P.3d 564

2000-NMCA-088

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**William Mark MANN, Defendant–
Appellant.**

No. 19,479.

Court of Appeals of New Mexico.

June 6, 2000.

Certiorari Granted, No. 26,582,
Oct. 19, 2000.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.

Billy R. Blackburn, Albuquerque, NM, for Appellant.

## OPINION

APODACA, Judge.

{1} Defendant appeals his convictions for second-degree murder, intentional child abuse resulting in death, and aggravated battery of a household member. He raises three issues on appeal: (1) extraneous material was presented to the jury by one of the jurors, which (a) tainted the jury process and (b) entitled Defendant to a new trial, or at the least an evidentiary hearing, to determine whether Defendant was prejudiced by the extraneous material; (2) his convictions

for both second-degree murder and intentional child abuse resulting in death violate his right not to be placed in double jeopardy; and (3) the trial court erred in not giving an instruction on defense of another as a defense to the aggravated battery against a household member.

{2} On Issue 2, we hold that although Defendant can be charged with both second-degree murder and intentional child abuse resulting in death, he cannot be convicted of both crimes without violating his right to be free from double jeopardy. On Issue 3, we determine that Defendant was entitled to a jury instruction on his defense of another claim to the charge of aggravated battery against a household member. Finally, on Issue 1, the panel is divided, and on that issue this opinion represents a dissenting view. The majority having held otherwise on this issue, we affirm only the conviction of intentional child abuse resulting in death, based on our disposition of Issue 2. Departing from the views expressed by my esteemed colleagues, I would hold that extraneous material came before the jury, resulting in a presumption of prejudice to Defendant. I would also hold that the State failed to rebut the presumption and as a result Defendant is entitled to a new trial. Because I dissent on this issue, this opinion will first discuss Issues 2 and 3, on which the entire panel concurs, followed by my own discussion and proposed disposition of Issue 1.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{3} In the early morning hours of August 30, 1996, Noel Mann, Defendant's six-year-old son, suffered a fatal injury as a result of being impaled in the chest by a screwdriver. Defendant contended that the child, upon leaving the bathroom, slipped on a rug, knocked the screwdriver off a hamper, and then fell on the screwdriver, causing the fatal injury. The State contended that Defendant intentionally stabbed the child with the screwdriver. After the child received the injuries, Defendant's live-in fiancee, called 911 and attempted to help the child. Defendant, apparently believing that it would be fatal to the child if he was moved, attempted to prevent his fiancee from assisting by physically attacking her.

{4} During the trial, Defendant called a physicist as an expert witness to testify on the possibility or probability for the child's injury to have occurred in the manner contended by Defendant. The expert witness testified regarding the mechanics, including the speed of falling bodies, the biomechanics of hard objects striking the human body, the amount of force necessary to cause certain injuries, and the probability, in general terms, of a screwdriver falling off a hamper in such a manner as to cause the injuries that ultimately resulted in the death of Defendant's son. The expert concluded that, although a series of events playing out as Defendant posited was not "impossible," the "probability" of such an occurrence "was extremely small."

{5} After the jury returned a guilty verdict, Defendant's trial attorney interviewed some of the members of the jury. The interviews revealed that during jury deliberations, Juror No. 7, who had a background in engineering and physics, presented his views on Defendant's expert witness' testimony to the other eleven jurors. In particular, Juror No. 7 performed probability calculations for the other jurors and wrote those calculations down on an easel. The calculations he performed and presented were not presented by Defendant's expert witness.

{6} Defendant filed a motion for a new trial based on this information and filed a request for an evidentiary hearing to determine whether and to what extent extraneous material was considered by the jury in reaching its verdict. The trial court did not hold an evidentiary hearing, but instead, outside of the presence of both the State and Defendant, interviewed Juror No. 7 and the four other jurors that Defendant indicated had knowledge of the extraneous material. A transcript of those interviews was made available to both Defendant and the State. The trial court also informed both counsel before the scheduled interviews that if there were additional jurors they wanted to be interviewed or additional questions they requested be asked, they were to so advise the trial court. After interviewing the five ju-

rors, the trial court ruled that the jury based its decision solely on the evidence presented at trial. The court thus denied the motion for a new trial.

## II. DISCUSSION

### A. Defendant's Conviction for Second–Degree Murder and Child Abuse Resulting in Death Violated Defendant's Right to be Free from Double Jeopardy

{7} Defendant, relying on his constitutional right of protection from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and Article II, Section 15 of the New Mexico Constitution, contends that his conviction for second-degree murder for the death of his child and his conviction for child abuse resulting in death for the death of the same child violates his right to be free from double jeopardy. *See* U.S. Const. Amend V; N.M. Const. art. II, § 15. We agree.

{8} The double jeopardy clauses of both constitutions protect against multiple punishments for the same offense. *Swafford v. State,* 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991). Our Supreme Court has adopted a two-part test, known as the *Swafford* analysis, to be used in analyzing a double jeopardy claim based upon multiple punishments for the same offense.

> The first step is to ask whether the conduct underlying the offenses is unitary, i.e., whether the same conduct of the defendant violates more than one statute. The second step is to ask whether the Legislature intended to impose multiple punishments for the unitary conduct. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial.

*State v. Carrasco,* 1997–NMSC–047, ¶ 22, 124 N.M. 64, 946 P.2d 1075 (citations omitted; internal quotation marks omitted).

{9} Conduct is unitary if it is not sufficiently separated by time or place, and the object and result or quality and nature of the act cannot be distinguished. *See State v. Livernois,* 1997–NMSC–019, ¶ 20, 123 N.M.

128, 934 P.2d 1057; *State v. Contreras,* 120 N.M. 486, 490, 903 P.2d 228, 232 (1995); *Swafford,* 112 N.M. at 13–14, 810 P.2d at 1233–34. Defendant was charged with and ultimately convicted of second-degree murder and child abuse resulting in death. The State's theory was that Defendant impaled his son in the chest with a screwdriver. It is not disputed that there was only one act, the impaling of the child with the screwdriver, and only one victim. *Cf. State v. Barr,* 1999–NMCA–081, ¶ 18, 127 N.M. 504, 984 P.2d 185. As a result, there was no separation of time or place, and the result, quality, and nature of the act cannot be distinguished. *Swafford,* 112 N.M. at 13–14, 810 P.2d at 1233–34. Consequently, the act was unitary.

{10} Because we have determined that the conduct was unitary, we must next consider the second prong—whether the Legislature intended to impose multiple punishments in this instance. *Carrasco,* 1997–NMSC–047, ¶ 23, 124 N.M. 64, 946 P.2d 1075. Initially, we conduct this inquiry by determining if the elements of one offense are subsumed within the elements of the other. *Id.* If they are, then for double jeopardy purposes, the statutes are the same, and Defendant cannot be punished for violating both statutes. *Id.*

{11} To find Defendant guilty of child abuse resulting in death, the jury was required to find the following elements: (1) Defendant intentionally and without justification cruelly punished his son; (2) Defendant's actions or failure to act resulted in his son's death; (3) Defendant's son was less than eighteen years of age. *See* UJI 14–602 NMRA 1999; NMSA 1978, § 30–6–1(C) (1989). "Intentionally" is defined as purposely doing an act. *See* UJI 14–610 NMRA 1999. The elements of second-degree murder are: (1) Defendant killed another human being without lawful justification; and (2) Defendant knew that his acts created a strong probability of death or great bodily harm to another human being. *See* UJI 14–210 NMRA 1999; NMSA 1978, § 30–2–1(B) (1994). The State must also prove that Defendant acted intentionally, that is, that he purposely did the act the law declares to be a

crime even if he did not know it was unlawful. *See* UJI 14–141 NMRA 1999.

{12} Under either statute, there is a requirement that the jury find that Defendant intentionally committed an act that resulted in the death of his son. Because there are additional elements to the crime of child abuse resulting in death, namely that the victim is less than eighteen, and that Defendant must be acting to cruelly punish the victim, our inquiry should focus on whether Defendant could have committed intentional child abuse resulting in death without committing second-degree murder. Under either statute, he must act intentionally. Under the second-degree murder statute (Section 30–2–1(B)), Defendant must do an act that creates a strong probability of death or great bodily harm. Under the child abuse statute (Section 30–6–1(C)), Defendant's actions must result in the death of the victim. An act that results in the death of the victim, by definition, has a strong probability of resulting in the death of the victim.

{13} Because the child abuse statute requires a finding that Defendant intended to cruelly punish the child and that the victim be under the age of eighteen, the child-abuse statute and the second-degree murder statute can stand independently and thus the elements of one are not subsumed within the other. If the two statutes can stand independently, then there is a rebuttable presumption that the legislature intended multiple punishments. *Carrasco*, 1997–NMSC–047, ¶ 23, 124 N.M. 64, 946 P.2d 1075. Other indicia of legislative intent, however, such as the language, history, and subject of the statutes may be used to overcome the presumption. *See Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

{14} Under the facts of this appeal, we believe the presumption that multiple punishments are appropriate is overcome by the general rule that one homicide by the acts of one defendant should result in one homicide conviction. *See State v. Cooper*, 1997–NMSC–058, ¶ 53, 124 N.M. 277, 949 P.2d 660; *see also State v. Mora*, 1997–NMSC–060, ¶ 64, 124 N.M. 346, 950 P.2d 789 (stating that defendant's right to be free from

double jeopardy is violated by his conviction of intentional child abuse resulting in death and felony murder); *State v. Pierce*, 110 N.M. 76, 85, 792 P.2d 408, 417 (1990) (holding that it is a violation of double jeopardy for defendant to be sentenced for both intentional child abuse resulting in death and first-degree murder). Applying the rationale and holdings of *Cooper* and *Mora*, we hold that Defendant cannot be punished for both intentional child abuse resulting in death and second-degree murder.

{15} The next question we must address is which conviction should be vacated. As a general rule, the lesser offense must be vacated. *See Pierce*, 110 N.M. at 86–87, 792 P.2d at 418–19. Based on the facts of this case, Defendant could not have committed the offense of intentional child abuse resulting in death without also committing second-degree murder. For that reason, second-degree murder is a lesser included offense of intentional child abuse resulting in death. "The rule of merger precludes an individual's *conviction and sentence* for a crime that is a lesser included offense of a greater charge upon which defendant has also been convicted." *Id.* at 86, 792 P.2d at 418 (emphasis added). Defendant's conviction for second-degree murder must therefore be vacated.

**B. Defendant Was Entitled to an Instruction on Defense of Another**

{16} Defendant requested a jury instruction on defense of another by use of non-deadly force. Defendant orally amended the instruction in open court. The instruction requested was a defense to the charge of aggravated battery against a household member. Defendant contended that he was attempting to hold the screwdriver still to protect his son because he was afraid the boy might suffer more extensive injuries if the screwdriver was moved. It was Defendant's theory that if in fact he committed a battery against Patricia St. Jeor, the household member, it was justified because he was attempting to defend his son from further injury. The trial court refused to give the instruction on the basis that "it was [the court's] recollection that Mr. Mann testified

that he didn't remember this happening, that he didn't remember striking Ms. St. Jeor, and speculation as to why he did that would be speculation, and there's insufficient evidence before the court at this time for this instruction to be given."

{17} When a defendant raises defense of another as a justification for his actions, an instruction on the defense should be given " 'if there is any evidence, even slight evidence, to support the claim.' " *State v. Lucero,* 1998–NMSC–044, ¶ 6, 126 N.M. 552, 972 P.2d 1143 (quoting *State v. Duarte,* 121 N.M. 553, 556, 915 P.2d 309, 312 (Ct.App.1996)). Our Supreme Court has interpreted this standard to "require evidence that is 'sufficient to allow reasonable minds to differ as to all elements of the defense.' " *State v. Lopez,* 2000–NMSC–003, ¶ 23, 128 N.M. 410, 415, 993 P.2d 727 (quoting *State v. Branchal,* 101 N.M. 498, 500, 684 P.2d 1163, 1165 (Ct.App.1984)). UJI 14–5182 NMRA 1999 sets forth the elements of the defense of another—nondeadly force by defendant:

The defendant acted in defense of another if:

1. There was an appearance of immediate danger of bodily harm to _____ as a result of _____; and

2. The defendant believed that _____ was in immediate danger of bodily harm from _____ and _____ to prevent the bodily harm; and

3. The defendant used the amount of force that the defendant believed was reasonable and necessary to prevent the bodily harm; and

. . . .

5. The apparent danger to _____ would have caused a reasonable person in the same circumstances to act as defendant did.

{18} We must review the evidence presented to determine if there is any evidence, however slight, to support all elements of the defense. *Lucero,* 1998–NMSC–044, ¶ 6, 126 N.M. 552, 972 P.2d 1143. If a defendant presents sufficient evidence so that reason-

able minds may differ as to all elements of the defense, the defense instruction must be given. *State v. Gallegos,* 104 N.M. 247, 249, 719 P.2d 1268, 1270 (Ct.App.1986) (abrogated in part on other grounds by *State v. Alberico,* 116 N.M. 156, 168, 861 P.2d 192, 204 (1993)). There need not be a showing by Defendant that his son was in actual danger from the actions of Ms. St. Jeor. Rather, there must be a showing that Defendant was in fear of apparent or immediate danger. *Id.* at 250, 719 P.2d at 1271. There must be evidence, however, that Defendant's fear was reasonable. *Id.* There must be some evidence that Defendant "acted as a reasonable person would have acted in the same circumstances." *Id.* With these principles in mind, we now examine the evidence presented.

{19} The victim of the aggravated battery testified that after hearing a commotion in the bathroom and a scream, she rushed to the bathroom to see what was going on, rushed back to call 911, put some clothes on, and then returned to the bathroom. She approached the child in an attempt to calm him and keep him still when she was struck by Defendant. She testified that "[Defendant] made a terrible animal sound, a terrible animal sound like a wounded animal."

{20} Defendant testified that after his son was impaled by the screwdriver, he knew the child had to be kept still and that he, Defendant, had to keep the screwdriver still so it would not cause additional damage. He also testified that, when Ms. St. Jeor came to help, he thought she was going to move the child, and he pushed her away for that reason. He also testified that he remembered standing up and pushing her out of the way.

{21} Dr. Samuel Roll, a clinical psychologist, testified that the human and parental instinct is such that it would not be unusual for parents to resort to primitive instincts when they perceive their child is in danger. When presented with a hypothetical representing Defendant's claims of what occurred, Dr. Roll testified that "anyone approaching the child, if the person felt they were protecting the child and there was some way that they had in their head was important to protect the child, if there was some risk of anyone doing anything to hurt the

child, I think that anyone who walked into that context would be at risk for being repelled by any force by this person who felt that he was trying to protect his child from further harm." Dr. Roll also stated that Defendant's reaction to the perceived threat was likely to occur among people in general. The psychologist then testified that Defendant told him that he thought Ms. St. Jeor was going to move the screwdriver and he "moved her out of the way." Finally, the witness explained that:

> One of the situations that makes any of us behave about as primitive[ly] as we can behave is when our child is in danger and we think there [is] some way to help [when] someone is endangering the child. At that point we become primitive and probably call on very basic instincts, not just for human beings, but almost any mammal. [If s]omebody is going to hurt the child, the first step is to make sure that you keep that person away from the child. So that's very primitive, very predictable. . . .

{22} The sheriff's deputies and emergency personnel who responded to the scene of the incident testified that when they arrived, Defendant would not allow the emergency personnel access to the child. Deputy Ronnie Weller testified that when he arrived, "[Defendant] was in a crouched position on the floor over the child. Deputy Johnston was attempting to get [Defendant] to let go of the child. [Defendant] was rocking and making some noises, kind of like grunting, also saying things to the nature of if they move him they will kill him." Deputy Johnston testified that Defendant was adamant about the child not being moved. According to Deputy Johnston, Defendant stated "Don't pull the screwdriver out[;] you will kill him." Richard Kearnery, a paramedic with the Bernalillo Fire Department testified that Defendant told him not to pull the screwdriver out and that Defendant was growling and showing his teeth. Mr. Kearney testified as well that normally you do not remove objects that have penetrated someone until the injured person is in an emergency room or operating room.

{23} Having reviewed and considered these facts, we hold that there was sufficient evidence for a jury to find that Defendant feared his son was put in danger by the actions of Ms. St. Jeor and that those fears were reasonable. *See Gallegos*, 104 N.M. at 250, 719 P.2d at 1271; *see also State v. Ungarten*, 115 N.M. 607, 611, 856 P.2d 569, 573 (Ct.App.1993) (stating that when there is evidence presented in support of a defense, however slight, it is the court's duty to instruct on the defense).

{24} The State claims that the "hybrid test" adopted by our Court in *Gallegos*, 104 N.M. at 250, 719 P.2d at 1271, precludes the giving of the instruction in this case. We disagree. Under the hybrid test, there must be "evidence that an objectively reasonable person, [placed in] Defendant's subjective situation, would have thought that [his son] was threatened with [harm], and that the use of . . . force was necessary to prevent the threatened injury." *Duarte*, 121 N.M. at 557, 557–58, 915 P.2d at 313, 313–14. The State contends Defendant's actions were unreasonable per se and consequently an objectively reasonable person would not have acted as Defendant acted. Dr. Roll, however, essentially testified that it was not unlikely for a person in Defendant's subjective position to act in that manner.

{25} We hold that there was sufficient evidence presented to require the giving of the defense-of-another instruction as a defense to the charge of aggravated battery on a household member.

### C. Whether Extraneous Material Reached the Jury and, if so Whether the State Rebutted the Presumption that the Extraneous Material Was Prejudicial

{26} This subsection of the opinion represents only the dissenting view of the author. Judge Armijo's opinion, joined by Judge Wechsler, represents the majority opinion of the Court on Issue 1.

{27} I will address Issues 1(a) and 1(b) together, rephrasing those issues because I believe the proper inquiry in this case is whether the State has rebutted any pre-

sumption of prejudice that might arise from the introduction of extraneous material.

{28} Defendant contends that Juror No. 7 relied on his expertise as an engineer, as well as his background in physics, in performing calculations that discredited Defendant's expert witness, and as a result, brought extraneous material before the jury. The State disputes that contention. According to the State, by performing calculations and presenting them to the jury, Juror No. 7 was simply filtering the evidence presented through his engineering experience and sharing that experience with the jury within the context of the deliberation process. I disagree. By filtering the evidence, to use the State's description, Juror No. 7 was using his "scientific, technical or other specified knowledge [to] assist the trier of fact to understand the evidence." *Shamalon Bird Farm v. U.S. Fidelity & Guar. Co.*, 111 N.M. 713, 714, 809 P.2d 627, 628 (1991) (quoting NMRA 2000, § 11–702). In essence, Juror No. 7 was acting as an expert witness, and it is precisely this "filtering" that I would determine brought extraneous material before the jury. *See State v. Steinkraus*, 76 N.M. 617, 620, 417 P.2d 431, 432 (1966) (determining that expert testimony is to be considered additional evidence).

{29} The jurors were instructed before opening statements that they were to decide the case based solely on the evidence presented at trial. *See* UJI 14–101 NMRA 1999. At the conclusion of evidence, they were instructed that it was their duty to determine the facts from the evidence produced in court. *See* UJI 14–606 NMRA 1999. The jury was properly instructed that it was to consider only the evidence before it and that it was not to consider any extraneous information in reaching a verdict.

{30} Extraneous information has been defined as "[c]ommunication of specific knowledge from a particular juror to others." *State v. Sacoman*, 107 N.M. 588, 590, 762 P.2d 250, 252 (1988). In *Sacoman*, our Supreme Court recognized the balance that must be drawn between the jury fairly considering the evidence before it and drawing upon its collective life experiences, on the one

hand, and considering facts not before it, on the other.

> Most certainly jurors are not precluded from drawing on their wisdom and experience and engaging in a free exchange of ideas and subjective opinions during the course of their deliberations.... The point, however, is that such deliberations must take their content from the record facts before them, not from external facts brought into the jury room by a juror and thus not screened through the judicial process.

*Id.* at 591, 762 P.2d at 253 (quoting *People v. Huntley*, 87 A.D.2d 488, 452 N.Y.S.2d 952, 955 (1982).

{31} The first inquiry, then, is whether extraneous information reached the jury. *See State v. Doe*, 101 N.M. 363, 366, 683 P.2d 45, 48 (Ct.App.1983). If the calculations performed by Juror No. 7 and presented to the jury are not extraneous information, the inquiry is over. In its most general sense, extraneous information consists of facts or evidence not elicited during trial that is communicated to the jury. *See Sacoman*, 107 N.M. at 590, 762 P.2d at 252. In *Sacoman*, two jurors provided information to the other jurors concerning procedures relied on by restaurants to pay employees who failed to punch the time clock at the end of their shift. The Court concluded that this constituted extraneous information. *Id.* at 591, 762 P.2d at 253.

{32} From *Sacoman*, and the cases on which it relied, I would determine that extraneous information is material that (a) would not otherwise be available to the other jurors because the information was not presented at trial, and (b) the information was available to the juror who disseminated it either as a result of his specialized training or his peculiar experiences. *See Sacoman*, 107 N.M. at 591, 762 P.2d at 253. Applying these principles to this case, I would examine the information available to the jury at the beginning of deliberations, as well as the information presented to the jury by Juror No. 7.

{33} Defendant's expert, Dr. Alan Watts, testified in depth regarding the mechanics involved when a body falls forward and a screwdriver or other object is dropped on a

hard surface. He also testified in more general terms regarding the probability of a screwdriver being knocked on the floor and bouncing up in such a way as to impale a body falling forward.

{34} Juror No. 7, during the trial court's interview, stated that "[m]y issue was I don't think they answered the right question." He then went on to explain in detail what information he presented to the jury. "In my professional judgment ... looking at this from [an] engineering problem, this whole scenario with [a] screwdriver on top of a hamper ultimately impaling a kid, there's a sequence that has to occur in some form or fashion for that to happen." The juror then went through his own five-step probability calculations that apparently took about thirty minutes. By the juror's own admission, none of that information was presented during the trial and was available to him only because of his background in engineering and physics. Apparently, Juror No. 7 felt compelled to present his probability calculations to the other jurors because he concluded that the "right question" was not asked.

{35} The trial court interviewed only five of the twelve jurors and, although the court did not make an explicit finding that extraneous information was presented to the jury, it did find that at least the five jurors interviewed did not rely upon any extraneous material in reaching their decision. The trial court stated, "I believe that the jury in this case took the evidence as they saw it *in court,* made a decision based on their [conscience] and on the evidence *presented in court.*" (Emphasis added.) It is not clear from the court's ruling whether it found that extraneous material had actually reached the jury but concluded in any event that Defendant was not prejudiced or whether the court determined that, even assuming such material reached the jury, Defendant was not prejudiced. Whichever determination on the first prong was made by the trial court, it clearly found no prejudice to Defendant.

{36} In my view, whether the trial court actually found the information provided by Juror No. 7 to constitute extraneous material is not controlling. Having reviewed the information presented by Juror No. 7, in view

of the principles enunciated by our Supreme Court in *Sacoman,* I would conclude, as a matter of law, that the information indeed constituted extraneous material. Specifically, it was information that would not otherwise be available to the jury and constituted a "[c]ommunication of specific knowledge from a particular juror to others." *Sacoman,* 107 N.M. at 590, 762 P.2d at 252; *see also Shamalon Bird,* 111 N.M. at 715, 809 P.2d at 629 (describing what constitutes expert testimony); *Steinkraus,* 76 N.M. at 620, 417 P.2d at 432 (stating that expert testimony is to be considered evidence).

{37} The majority poses the issue as whether a juror's reliance on his technical background, as well as his communication of this reliance to fellow jurors, constitutes misconduct. I submit that what transpired in the jury room in this case was beyond communication relying on technical background. What occurred here was the bringing into the jury room of the juror's *own calculations* based on his specialized knowledge, as well as his version of responses to questions that he maintained were never asked of the sole expert witness who testified on the subject at trial. It matters not that Juror No. 7 based his own calculations upon the testimony of Dr. Watts or other facts adduced at trial. *See Alford v. Drum,* 68 N.M. 298, 302, 361 P.2d 451, 453 (1961) (acknowledging that expert testimony is often based on facts already in the record). What matters is that, in using these facts, which in themselves were not extrinsic, to perform his own calculations and then proceeding to explain those calculations by using his own five-step process, independent of Dr. Watts' testimony, Juror No. 7 presented extraneous material. It also is not significant, as maintained by the majority, whether the juror's own calculations discredited Dr. Watts' testimony on the likelihood or probability of the impaling of the young boy occurring in the manner testified to by Defendant. To me, the real issue is whether Juror No. 7's presentation was equivalent to that of an expert witness. *Shamalon Bird* held that expert testimony is testimony explaining "steps followed [by the expert witness] in reaching [his] conclusion." *Shamalon Bird,* 111 N.M. at 715, 809 P.2d at

629. That is precisely the role played by Juror No. 7 during jury deliberations.

{38} The majority proposes that "it was not improper for Juror No. 7 to have expressed what he felt were the questions Dr. Watt's testimony did not answer." In so doing, the majority claims, the juror was only "recognizing and showing his views" concerning the weakness of Defendant's defense. The record reflects, however, that in making his presentation to his fellow jurors, Juror No. 7 did not argue that Dr. Watts had not provided certain *answers*, thus weakening the defense's theory, but instead claimed that the *"right questions"* had not been asked. Apparently, in his thirty-minute presentation, Juror No. 7 not only provided the so-called right questions but then proceeded to answer them. Consequently, to categorize the juror's statements to his fellow jurors as merely a "common sense" opinion, as the majority terms it, is not a correct characterization of what occurred.

{39} The majority also emphasizes that Defendant accepted the possibility that Juror No. 7 would use his expertise during deliberations because Defendant did not challenge Juror No. 7 during voir dire. Acceptance of Juror No. 7 at voir dire, however, did *not* give that juror carte blanc permission to inject into jury deliberations evidence (*his own* opinion, *his own* calculations, *his own* five-step process, and *his own* responses to questions he insisted were not asked at trial) that I maintain constituted impermissible and extraneous material. *See Steinkraus*, 76 N.M. at 620, 417 P.2d at 432 ("[O]bservations and conclusions [by an expert witness] are facts [that] ... constitute evidence....").

{40} Juror No. 7, having disclosed his technical and professional background, assured the trial court and the parties during voir dire that, despite that background, he would be able to reach a verdict based solely on the evidence adduced at trial. He later took an oath to that effect. I submit he violated that oath. To be sure, as the majority observes, Defendant took a calculated risk by not objecting to or challenging Juror No. 7's selection as a juror, either for cause or by using one of his peremptory challenges. But that risk did not include consenting to a violation of the juror's duty to reach a verdict based solely on the evidence presented at trial. In my view, Juror No. 7 took much more into the jury room then his own life and technical experiences.

{41} The majority relies on a California Supreme Court case, *In re Malone*, 12 Cal.4th 935, 50 Cal.Rptr.2d 281, 911 P.2d 468 (1996), for the proposition that "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial." *Id.* at 486. Although that quote is a correct statement of the law, the majority fails to recognize the discussion immediately following the quoted passage on what does constitute juror misconduct. "[A] juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." *Id.*

{42} I do not claim, as the majority implies, that "specialized training *alone* ... render[s] a juror's active participation in deliberations improper." I am not concerned that Juror No 7's general technical background rendered his participation in the jury deliberation as extraneous. During deliberations, Juror No. 7 could have stated that, based on his experience, Defendant's theory was virtually impossible. That would not have been improper. What concerns me, however, was the in-depth, 30–minute dissertation concerning probability calculations that he injected into the case.

{43} Juror No. 7 claimed he had "expertise or specialized knowledge of a matter at issue"—whether it was possible that the child impaled himself—and that he knew the answers to the right questions that were never asked. Juror No. 7 did not just use his "educational [and] employment background[ ] to express an opinion on a technical subject," but presented himself as an expert to the other jurors. Again, I do not suggest that specialized training alone somehow rendered the juror's participation as extraneous. I instead conclude that his claim of "expertise", as well as his "expert" presentation, was juror misconduct. *See id.* (holding such claims as juror misconduct).

{44} The trial court interviewed five of the twelve jurors. There were different versions among the jurors questioned by the court concerning whether Juror No. 7 had brought calculations on a piece of paper into the jury room, which he then transferred onto a board as he explained his own calculations to his fellow jurors. To be sure, questioning of the remaining jurors at an evidentiary hearing could have cleared up once and for all the extent of materials or figures previously calculated that were brought into the jury room. The question of whether Juror No. 7 brought any document into the jury room is inconsequential, however. What is significant to me is that the juror went through his own calculation process, whether transferred from a piece of paper or whether imprinted mentally in his own mind. Regardless, Juror No. 7 told the trial court that he used his "professional judgment," approaching the case much like he would any "engineering problem," and stated that "this whole scenario with [a] screwdriver ... there's a sequence that has to occur." He admitted to performing a "fairly simple five-step probability" calculation that he claimed, to use the majority's words, "grew out of Dr. Watts' testimony." *See Shamalon Bird,* 111 N.M. at 715, 809 P.2d at 629 (stating that such five-step probability calculations are methods used by expert witnesses).

{45} The majority notes that Juror No. 7 was simply experimenting with the probability of events happening as Defendant claimed. Relying on *State v. Chamberlain,* 112 N.M. 723, 819 P.2d 673 (1991), the majority proposes that such experiments are not improper. *Id.* at 733, 819 P.2d at 683. Our Supreme Court in that case, however, did "not consider ... experimentations based on facts [or expert opinion] not properly before the jury." *Id.* at 731, 819 P.2d at 684. The Court only determined that "the jury ... did not consider evidence or statements that were not presented to the court." *Id.* In this appeal, we are addressing the issue of whether evidence in the form of expert testimony was presented to the jury without first being filtered through the judicial process. *See Sacoman,* 107 N.M. at 591, 762 P.2d at 253 (holding that all evidence must be "screened through the judicial process").

{46} In *Chamberlain,* the jury conducted experiments with evidence that was presented at trial. *Chamberlain,* 112 N.M. at 731, 819 P.2d at 684. No juror in that case claimed to have "expertise or specialized knowledge of a matter at issue." *In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 486. Nor did one juror give a thirty-minute presentation based on his or her own calculations. The Court in *Chamberlain* determined that experimenting with testimony and evidence from the trial were not improper; however, it acknowledged that "potential error may occur if an experiment creates a new evidentiary fact outside of the record for the jury." *Chamberlain,* 112 N.M. at 732, 819 P.2d 673.

{47} Juror No. 7 did not merely use Dr. Watts' testimony and the evidence presented at trial but expounded on the evidence and "testified" with answers to questions he contended were never posed to Dr. Watts. Juror No. 7's "experiment creat[ed] a new evidentiary fact outside of the record for the jury." *Id.* In short, *Chamberlain* did not consider juror misconduct in terms of "a juror's own claim to expertise or specialized knowledge of a matter at issue." *In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 486. It only discussed "evidence [and] statements that were presented" at trial. It thus appears to me that *Chamberlain* is not relevant to the facts in this appeal.

{48} Other cases cited by the majority, when viewed in their entirety, actually support the conclusion that the actions of Juror No. 7 went far beyond the use of his educational and professional background and resulted in juror misconduct. *See e.g., United States v. McMann,* 435 F.2d 813, 818 (1970) ("To the greatest extent possible all [evidence, including expert opinion] must pass through the judicial [process], where the fundamental guarantees of procedural law protect the rights of those accused of crimes."); *Ertsgaard v. Beard,* 310 Or. 486, 800 P.2d 759, 766 (1990) (holding new trial should be granted when a juror gives "specialized knowledge [to other jurors] concerning one of the disputed facts in the case under consideration"). The majority states that it

would be improper to overturn a verdict "the moment a juror passes a fraction of an inch beyond the record evidence." *McMann*, 435 F.2d at 817. Juror No. 7's presentation, however, went far beyond "a fraction of an inch."

{49} I share the majority's support of the case law protecting and insulating the privacy of our jury system. That protection disallows inquiries into intrinsic matters. As the majority concedes, however, it does not disallow inquiry into extrinsic matters that may have breached our jury deliberative process.

{50} Stripped of its language concerning the sanctity of jury room deliberations, the majority's opinion, in my view, represents nothing more than a different "judgment call" or "take" on the material presented by Juror No. 7. Was it or was it not extraneous? The majority goes through great lengths to show that it was not. I respectfully disagree with that conclusion. When all is said and done, I view the material as opinion evidence supporting the State's theory, independent of the testimony of the only expert at trial. That independent opinion evidence, I submit, was extraneous material as discussed in the case law. *See e.g., In re Malone*, 50 Cal. Rptr.2d 281, 911 P.2d at 486 ("[A] juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.").

{51} Because I would conclude that extraneous information was considered by the jury, I next discuss whether that information prejudiced Defendant, a determination required by *Sacoman*. Once a determination is made that extraneous information is presented to the jury, there is a presumption of prejudice. *See Sacoman*, 107 N.M. at 591, 762 P.2d at 253. This presumption may be rebutted by a showing of no actual prejudice. *Id.* In *State v. Pierce*, 109 N.M. 596, 788 P.2d 352 (1990), Justice Ransom, specially concurring, recognized certain procedures to follow when it is determined that extraneous material has reached the jury:

> If a defendant makes a preliminary showing of the existence of extraneous prejudicial information ... that implicates a due process violation, the court must conduct a hearing to determine the existence of a taint on the jury deliberation process.

> The introduction of extraneous prejudicial information ... creates a presumption of prejudice. If, at the hearing, the trial court finds a reasonable possibility of prejudice, a new trial should be granted.

*Id.* at 605–06, 788 P.2d at 361–62 (Ransom, J., specially concurring) (footnotes omitted).

{52} In determining prejudice, the trial court must consider "how the material was received [by the jury], how long it was available to the jury, the extent to which the jury discussed the material, whether [the jurors] considered [the material] before they reached a verdict or after, and, if before, at what point in the deliberations they received the material." *Doe*, 101 N.M. at 366–67, 683 P.2d at 48–49. Additionally, "[t]he strength of the State's case has a bearing on the issue of prejudice." (citation omitted).

{53} The jury received the material when Juror No. 7 stood up before the jury, advising his fellow jurors of his expertise as an engineer and telling them that, in his professional judgment, they needed to consider other information not presented by Defendant's expert or presented by the State. At an easel, the juror gave a discourse to the other jurors in physics and probabilities. As previously noted, it took approximately thirty minutes for the material to be presented. It was not simply a passing reference made by one juror to another. The presentation was given before the jury took a vote on the intentional child abuse resulting in death charge or the second-degree murder charge. The material was presented after the first full day of deliberations but only three or four hours into the jury's verdict consideration.

{54} From Juror No. 7's own words ("I don't think they answered the right question."), I believe the extraneous information provided by him was apparently intended to contradict Defendant's case, for he then gave a thirty-minute discourse of his own five-step probability process. This is a factor the trial court must consider as well. *See Sacoman*, 107 N.M. at 591–92, 762 P.2d at 253–54. (stating that extraneous information contradicting an asserted defense "was identified in [*People v. Martinez*, 82 Cal.App.3d 1, 147 Cal.Rptr. 208, 220 (1978) ] as a factor consti-

tuting prejudice [requiring] that the conviction be reversed"). The information presented was not "screened through the judicial process." *Sacoman*, 107 N.M. at 591, 762 P.2d at 253 (quoting *Huntley*, 452 N.Y.S.2d at 955 (internal quotation marks omitted)). This presents not only possible problems implicating due process, but it also may implicate a defendant's right to confront the evidence against him pursuant to the U.S. Const. Amend. VI. *See Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). The information was not subjected to scrutiny by Defendant's trial counsel. Any doubt there may be on what effect or prejudice the information provided had on the jury, I submit, should be resolved in favor of Defendant, in light of the existing presumption of prejudice.

{55} In *Martinez*, a case cited with approval by our Supreme Court in *Sacoman*, the California Court of Appeal set forth three factors that must be considered in deciding whether a defendant was prejudiced by juror misconduct in receiving evidence not presented in court—"[W]hether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened[, or] whether any asserted defense has been contradicted." *Martinez*, 147 Cal.Rptr. at 220. "If the answer to [*any one*] of these questions is in the affirmative, the defendant has been prejudiced...." *People v. Castro*, 184 Cal.App.3d 849, 856, 229 Cal.Rptr. 280, 284 (1986); *see also Smoketree–Lake Murray, Ltd. v. Mills Concrete Constr. Co.*, 234 Cal.App.3d 1724, 286 Cal.Rptr. 435, 449 (Ct.App.1991). The California courts, when faced with the issue of extraneous material being presented to the jury, have consistently held that once extraneous material is brought before the jury, there is a presumption that the material prejudiced the complaining party, and unless the presumption is rebutted, the complaining party is entitled to a new trial. *See Smoketree–Lake Murray, Ltd.*, 286 Cal.Rptr. at 447. ("In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court has a constitutional obligation to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred,

prevented the complaining party from having a fair trial." (Internal quotation marks omitted)).

{56} Because extraneous information was presented, the burden shifted to the State to rebut the presumption of prejudice. *See Sacoman*, 107 N.M. at 591, 762 P.2d at 253. Additionally, when the factors set forth in our own case of *Doe*, 101 N.M. at 366, 683 P.2d at 48, and by the California courts in *Martinez* and *Castro* are considered, the presumption of prejudice is great. The evidence (1) was presented before the jury reached a decision on the intentional child abuse and second-degree-murder charge; (2) contradicted Defendant's case, due to a great extent on Juror No. 7's thirty-minute discourse involving a five-step process, based entirely on the premise that he did not "think they answered the right question;" and (3) was before the jury for a substantial period of time. The fact that there might be "[c]onvincing evidence of guilt does not deprive a defendant of the right to a fair trial." *Martinez*, 147 Cal.Rptr. at 220.

{57} The trial court interviewed only five of the twelve jurors. Four jurors testified that the information presented by Juror No. 7 was not the determinative factor or even a significant factor in their decision. Juror No. 7 testified that the information he presented was only one of many factors that influenced his decision. Seven of the jurors, however, were not interviewed by the trial court. For this reason, there is no way of knowing whether those seven jurors were in any way influenced by the extraneous material. I believe this fact raises "a reasonable possibility of prejudice." *Pierce*, 109 N.M. at 605–06, 788 P.2d at 361–62 (Ransom, J., specially concurring).

{58} It was the State's burden to show that Defendant was not prejudiced by the extraneous material, not Defendant's burden to show otherwise. By failing to have those seven jurors interviewed by the trial court, I would hold that the State failed to rebut the presumption that the extraneous material prejudiced Defendant. For this reason, it cannot be said that Defendant acquiesced or waived the trial court's "interviews" with the

remaining seven jurors. It was not Defendant's duty to assist the State in rebutting the presumption of prejudice that Defendant was entitled to under our case law.

{59} Alternatively, I would hold that due process and fair trial requirements imbedded in our state's Constitution required the trial court to conduct a full evidentiary hearing. At that hearing, the parties would be afforded the right to examine and cross-examine all jurors, not only the five jurors interviewed privately and in chambers by the court.

{60} In determining a remedy, I considered whether remanding the case for the trial court to interview the other jurors would be feasible. To do so, however, is problematic after the lapse of time in this appeal since trial. The trial ended in February 1998, over two years ago. Consequently, there may be great risk that the juror's recollections regarding the impact of the extraneous material would be impaired. Additionally, the trial judge who presided at trial has since retired, therefore requiring a new judge to conduct the interviews. For these reasons, I believe that the State could not meet its burden of showing Defendant was not prejudiced. I would hold, then, that the State had an opportunity to rebut the presumption of prejudice during the initial interviews and failed to do so at that time. This failure, in my view, cannot be corrected by conducting interviews of the remaining jurors on remand. I therefore would conclude that Defendant's convictions for both second-degree murder and intentional child abuse resulting in death should be reversed and the case remanded for a new trial on those two charges.

{61} On remand, Defendant could be charged with both second-degree murder and intentional child abuse resulting in death. *See Pierce*, 110 N.M. at 87, 792 P.2d at 419. In a new trial, however, the State would be permitted to proceed on both theories. If a jury eventually returned guilty verdicts on both charges, the trial court would then dismiss the second-degree-murder charge, because it is a lesser included offense of child abuse resulting in death.

{62} The majority having expressed a different view and holding on this issue, I dissent.

## III. CONCLUSION

{63} We conclude that: (1) Defendant's right to be free from double jeopardy was violated by his convictions and sentencing for both second-degree murder and intentional child abuse resulting in death; and (2) there was sufficient evidence presented to support an instruction on defense of another to the aggravated battery on a household member charge and the trial court erred by not giving such an instruction.

{64} Because second-degree murder is a lesser included offense of intentional child abuse resulting in death and the rule of merger prohibits both a conviction and sentence for the lesser charge, we remand for the entry of an order vacating Defendant's conviction for second-degree murder. Defendant's conviction of intentional child abuse resulting in death is affirmed. We reverse Defendant's conviction for aggravated battery of a household member and remand for a new trial consistent with this opinion, only on that issue.

{65} **IT IS SO ORDERED.**

WECHSLER and ARMIJO, JJ., concurring in part.

ARMIJO, Judge.

{66} We concur in that portion of Judge Apodaca's opinion regarding the double jeopardy and jury instruction issues. However, our opinion below represents the opinion of the Court regarding Defendant's claim of juror misconduct. This issue is one of first impression in New Mexico, the question being whether a juror's reliance upon his disclosed technical background, as well as his communication of this reliance to his fellow jurors, constitutes misconduct. On this issue, we affirm the district court's denial of Defendant's motion for a new trial.

## STANDARD OF REVIEW

{67} We begin by noting the applicable standard of review. It is well estab-

lished that we would reverse the trial court's ruling on allegations of juror misconduct only upon an abuse of discretion. *See Gonzales v. Surgidev Corp.,* 120 N.M. 133, 148, 899 P.2d 576, 592 (1995); *State v. Chavez,* 98 N.M. 682, 684, 652 P.2d 232, 234 (1982) ("The trial court has broad discretion in granting or denying a motion for new trial, and such an order will not be reversed absent clear and manifest abuse of that discretion."). This standard applies both to the district court's ultimate ruling and to our review of the means by which it inquired into Defendant's allegations. *See State v. Sacoman,* 107 N.M. 588, 592, 762 P.2d 250, 254 (1988); *see also Hard v. Burlington N.R.R.,* 870 F.2d 1454, 1461–62 (9th Cir.1989). Reliance upon this standard reflects not only the important policies implicated by motions for new trial, *see State v. Gonzales,* 105 N.M. 238, 241, 731 P.2d 381, 384 (Ct.App.1986) (noting interest in enforcing lawful verdicts), but also the trial court's unique position in passing upon such questions in the first instance, *see Allyn v. Boe,* 87 Wash.App. 722, 943 P.2d 364, 369 (1997) (noting in review of claimed juror misconduct that trial court "saw both the witnesses and the trial proceedings, and had in mind the evidence").

## FACTUAL AND PROCEDURAL BACKGROUND

{68} The trial, which included the testimony of thirty-nine witnesses, lasted for more than a month. Upon its deliberation, the jury convicted Defendant, among other counts, of unlawfully killing his son. Some time after the verdict, Defendant's representatives interviewed several of the jurors, including Juror No. 7, and moved for a new trial claiming that Juror No. 7 had improperly shared "calculations, and expert opinions" during deliberations. Specifically, Defendant alleged:

6. The juror took it upon himself to serve the function of prosecution expert witness during deliberations by doing calculations, explaining physics and engineering to the remainder of the jurors and conducting experiments which discredited the opinions given by Dr. Watts.

7. That same juror actually presented calculations which he had independently done in order to discredit the opinions of Dr. Watts. He had them written on a sheet of paper which he copied on to the easel.

We restrict our remaining discussion of the facts to the issue of alleged juror misconduct involving Juror No. 7.

### Juror No. 7

{69} Defense counsel knew of Juror No. 7's professional status and technical background prior to selecting him to serve on the jury. Indeed, prior to voir dire, an extensive process in which the parties and court invested approximately a full week, counsel had prospective jurors complete a detailed questionnaire which inquired, among other matters, as to each potential juror's background, employment, and education. Juror No. 7, in his response to the questionnaire, informed counsel of his technical background and his employment as an engineer with the Sandia National Laboratories. Then, upon individual voir dire—during which counsel and the court spoke to Juror No. 7 individually and on the record—he again disclosed that he worked at Sandia National Laboratories and that "[his] training is as an engineer." In response to further questioning from the court, he stated that despite his background, he would be able to reach a verdict based solely on the evidence at trial. Defendant made no objection to Juror No. 7 serving on his jury.

### Doctor Watts' Testimony

{70} At trial, Defendant called Dr. Alan Watts to testify as an expert witness regarding the general probability of Noel being killed in a manner consistent with Defendant's theory. Doctor Watts described his understanding of the series of events necessary to support Defendant's theory of the accident:

[T]he boy trips on a rug ... and starts to lose balance as he goes forward. He now puts his arms out, and his left arm goes over the top of a nearby sink and catches the top of the hamper a couple inches

higher. There are various items on top of the hamper. . . .

And there's also a screwdriver underneath. His hand sweeps across and somehow moves the screwdriver off the hamper. At the same time, he is falling forward. So what we have is a boy already starting to move and a screwdriver starting from a height of about two feet eight and a half . . . and now the issue is can the screwdriver get to the floor before the boy's chest does.

Doctor Watts thereafter discussed basic principles of physics and applied them to the hypothesis that Noel accidentally impaled himself upon a dropped screwdriver. He further demonstrated to the court that a screwdriver or other rod dropped onto a hard surface will bounce. As part of his presentation, he performed several calculations on the board in the court room. These calculations pertained primarily to the angle at which the screwdriver may have landed and the force Noel's body would have exerted upon it on impact.

{71} Doctor Watts made clear that the object of his demonstration was not to prove that Defendant's screwdriver fell "one way or the other" the day Noel was killed, "but that it's random every time." While he stated he could not calculate the precise probability of Noel having been stabbed as Defendant claimed, he did represent that there was "a relatively small overall probability" of such an occurrence, that its occurrence would be a "freakish accident." He further stated: "So although I can't predict a precise behavior on any one screwdriver and any one bounce you can anticipate it becomes possible for the blade to be pointing upward as the boy's body comes down."

{72} The State put on no rebuttal expert testimony. However, it extensively cross-examined Dr. Watts. On cross-examination, the State brought out several factors that Dr. Watts had not considered in formulating his opinion. For example, Dr. Watts did not consider the angle of the wound paths in Noel's chest and how this would affect the probability of his being stabbed in the manner Defendant suggested. He did not consider the screwdriver's position on top of the hamper in relation to the other items on the hamper and how this would have affected how it fell. And he did not consider Noel striking the sink with his arm on his way down and how this may have affected the force with which he fell.

*Juror Interviews*

{73} In his motion alleging juror misconduct, Defendant identified five jurors who he believed to have information pertaining to the claimed misconduct. In response, the district court conducted in camera, record interviews with these five jurors. In order, the court interviewed Jurors Nos. 9, 4, 10, 7, and 6.

{74} Juror No. 9 told the district court that as to the charges Defendant had unlawfully killed his son, the jury was "leaning toward conviction early on." He also expressed his personal opinion, also formulated early on:

[T]hat kid didn't fall on that screwdriver and stab himself. Just no way. Not in a zillion billion years did that happen.

You know, there's no way a kid can fall with enough force to jab a screwdriver into his chest and not smash his face. How did he not break his nose or bruise his lips[?] How does that happen? It just—it's impossible to happen.

Of Juror No. 7, he noted that he had written "some calculations" on the dryerase board that had been provided to the jury. He also stated: "But, see, I kind of viewed that more as here is a guy that knows numbers, knows mathematics, who knows probabilities. I viewed it as his life experience."

{75} Juror No. 4 also noted that the jury had a show of hands on the murder charge early on and that this "vote" was unanimous in favor of conviction. Of Juror No. 7, he noted that "[h]e didn't say he did any experiments at home" and that "[h]e didn't bring papers" into the jury room. He also noted of Juror No. 7's presentation: "he says, Let's take Dr. Watts' figures. And you might fly this by that—being an engineer and probably half-way physisist [sic], he said using his figures, it can't come out the way he said it

did. In my mind, common sense tells me it can't come out."

{76} Juror No. 10 stated that she "d[id]n't know if [Juror No. 7] brought anything from home. He did have a couple of figures that he had thought about and it was explaining his point of view on the testimony of Dr. Watts." She also noted that the jury took early, initial votes on the counts against Defendant, although she could not remember in which order, and that "[t]here was a lot of guilty, a couple of not guilty and a couple of undecided."

{77} Next, the district court interviewed Juror No. 7, who spoke at length regarding all aspects of the jury's deliberations. Of his own participation, he maintained that he did not dispute or discredit Dr. Watts' testimony; instead, he said Dr. Watts' were "fine calculations and I would agree with the calculations." Instead of disagreeing with the testimony, he felt it did not "answer the right question," that is, he could not see the "logical tie" between Dr. Watts' testimony and Defendant's conclusion that his son died as he argued. Instead, he felt Defendant's theory "just doesn't jive." Therefore, to "verify [his] own gut feeling" on the subject, Juror No. 7 sought to "quantify" his thinking on the evidence at trial.

{78} Toward this end, he walked through "a probability calculation, and [he] did this in [his] head first." This calculation found its genesis in Dr. Watts' calculations presented at trial. Juror No. 7 insisted that he conducted no experiments. Instead, he told the court that he used his "professional judgment" and approached the matter as an "engineering problem." As he stated to the court, echoing Dr. Watts' explanation of the series of events necessary to prove Defendant's theory correct, "this whole scenario with [a] screwdriver on top of a hamper ultimately impaling a kid, there's a sequence that has to occur in some form or fashion for that to happen." Accordingly, he "did a fairly simple five-step probability" calculation which, again, grew out of Dr. Watts' testimony.

{79} This exercise, in essence, distilled five distinct events from Defendant's argument of what happened to Noel. Juror No. 7 approached these events as questions: (a) did the screwdriver land at the correct angle to the floor relative to Noel's falling body?; (b) did it land "blade up"?; (c) did it separate itself, as it fell, from the other items with which it had been knocked off the hamper?; (d) did it land at the correct location on the floor?; and finally (e) how frequently ought such accidental deaths occur in the population-at-large? Of the last question, he stated:

> Well, I go quite regularly to the hardware stores. I have never seen an OSHA warning label on a screwdriver that says "caution, this might be hazardous to your health, take the following precautions." ... So I am saying man, there's no-I guess you would call that consumer protection or something, but there's no evidence from somebody that that's kind of their job to look out for our protection on this that ever indicates there's a problem.

It is not clear from the record to what extent Juror No. 7 conducted this inquiry in his head and to what extent he shared it with his colleagues on the jury.

{80} Finally, the court interviewed Juror No. 6. Of Juror No. 7, she stated: "I feel that the particular juror that-the engineer juror, to me that was just his way of venting his feelings and thoughts and emotions during the deliberation." She further stated:

> We all went home that weekend over deliberation, and it was on my mind, the whole trial during the whole weekend, and I don't see how any of us could have not thought about it. If he took it upon himself to do the calculations and maybe possibly explain a few things in better English that certain people could understand-I mean, during deliberation I think jurors discuss all the evidence and, you know, some things are presented to us in such a legal fashion that it kind of goes over our head maybe, and sometimes we do need it just explained on like a kindergartner level.

{81} None of the jurors told the district court that Juror No. 7's statements played a significant role in their having reached the decision they did. After conducting the interviews, the district court denied Defen-

dant's motion for a new trial, ruling that no juror misconduct had occurred; that is, the district court ruled Defendant had failed to show that Juror No. 7 had introduced any extraneous influence to the deliberations. Specifically, the court stated:

> The one thing that I do know is I am not God. I am sworn to do this job under the boundaries of the law. At the same time to attempt, if such occurs, to correct what is an obvious ... miscarriage of justice. What I cannot do and should not do is place my personal feelings, my feelings of what may or may not have been done by the jury. As I stated before, I believe in the jury system.
>
> . . . .
>
> [A]gain, and after the most serious contemplation, I find that there has not been sufficient evidence before this Court to require either a further inquiry into the jury's conduct, nor is there such that would require me in my role as a judge to set aside that verdict. I feel I believe in the jury system. I believe that the jury in this case took the evidence as they saw it in court, made a decision based on their [consciences] and on the evidence presented in court, although some people may feel that they would have come to a different resolution. That is not what our system is about, and for me to place myself in the stead of the jury to overturn that would be, I feel, [betrayal] of everything I believe about our system.

{82} Defendant appeals from this ruling.

### DISCUSSION

{83} As a central matter, this appeal implicates an age-old and venerated interest. The analysis we apply today has evolved expressly to safeguard the secrecy of jury deliberations from unwarranted invasion.

{84} The privacy of jury deliberations has been protected as nearly inviolable since the seventeenth century. *See generally* Note, *Public Disclosures of Jury Deliberations*, 96 Harv. L.Rev. 886, 891 n. 31 (1983). This protection is not motivated by some anachronistic concern, but is founded upon the prevailing interests of ensuring freedom of expression and debate, preventing the harassment of jurors, insulating the jury decision-making process from public pressure, and securing stability within the system and finality of judgments. *See, e.g., Clark v. United States*, 289 U.S. 1, 13, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *Duran v. Lovato*, 99 N.M. 242, 247, 656 P.2d 905, 910 (Ct.App.1982); *see generally Public Disclosures of Jury Deliberations*, 96 Harv. L.Rev. at 888–92. Above all, we rely upon juries to perform the profoundly democratic function of standing between an accused and the prosecutorial machinery of the State. For all these reasons, courts have long been understandably reluctant to intrude upon juror execution of this duty. *See, e.g., McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300 (1915) (noting concern that "all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding"); *Silagy v. Peters*, 905 F.2d 986, 1009 (7th Cir.1990) (recognizing potential of "constant attempts to undermine jury verdicts through the scrutiny of the juror's thoughts and deliberations"); *Hurst v. Citadel, Ltd.*, 111 N.M. 566, 570, 807 P.2d 750, 754 (Ct.App.1991) (declining to review affidavits pertaining to intrajuror communications).

{85} In deference to these concerns, we have disallowed inquiries into matters *intrinsic* and allowed inquiry only into matters *extrinsic* to the deliberative process. *See, e.g.,* Rule 11–606(B) NMRA 2000; *Hurst*, 111 N.M. at 569, 807 P.2d at 753; *see also Claudio v. State*, 585 A.2d 1278, 1302 (Del.1991) (discussing explicit distinction between intrinsic and extrinsic influences on jury deliberations). For this reason, it was Defendant's threshold burden below to show that something *extrinsic* to the trial process made its way into the jury's deliberation of the charges against him. This burden is not discharged merely by allegation; rather, Defendant must make an affirmative showing that some extraneous influence came to bear on the jury's deliberations. *See State v. Sena*, 105 N.M. 686, 688, 736 P.2d 491, 493 (1987) (ending inquiry upon defendant's failure to adduce sufficient evidence of juror misconduct). Only upon his discharge of this

burden will a court make any inquiry as to what prejudice this impermissible influence worked.

*Did Juror No. 7 introduce an extraneous influence upon deliberations?*

{86} This appeal raises a pair of related, but subtly distinct questions. First, does Juror No. 7's *status* as an engineer, with a general technical background, render his active participation in deliberations an extraneous influence on the process? And second, did the substance of Juror No. 7's statements to his fellow jurors introduce an extraneous influence upon deliberations?

### 1. *Juror No. 7's professional status.*

{87} Defendant knew of Juror No. 7's professional status and technical background prior to selecting him to serve on the jury. Indeed, the district court noted the "extensive voir dire" in issuing his ruling on Defendant's motion. During the voir dire, Juror No. 7 disclosed that he was an engineer and that he worked for Sandia National Laboratories. Furthermore, in his answers to the pre-voir dire questionnaire, he disclosed this technical background and training. Defendant made no objection—either for cause or peremptory—in light of these disclosures. Perhaps, Defendant overlooked the potential significance of what Juror No. 7 could bring to deliberations, or perhaps, he believed that someone of Juror No. 7's training could benefit his case; indeed, as Juror No. 7 stated during his in camera interview:

> [B]ased on what I heard from talking with the defense attorneys during this interim after the trial, the feedback I got from them is that yeah, Mr. Twohig in fact wanted me on the jury because I guess he thought that I was going to be the guy that would listen to his expert and then somewhat rubber stamp it and say, "Oh, yes, this is all correct, etc. etc."

We determine that Juror No. 7's professional training, without more, could not constitute an extraneous influence; indeed, Defendant's knowing acceptance of Juror No. 7 rendered his specialized training—as a general matter—intrinsic to the jury and the trial as a whole. *Cf. United States v. Costa,* 890 F.2d

480, 482 (1st Cir.1989) (commenting in analogous context that "[a]ny other rule would allow defendants to sandbag the court by remaining silent and gambling on a favorable verdict, knowing that if the verdict went against them, they could always obtain a new trial by later raising the issue of juror misconduct").

{88} The case of *Richards v. Overlake Hospital Medical Center,* 59 Wash.App. 266, 796 P.2d 737 (1990) is largely indistinguishable from the appeal at bar. In that case, a plaintiff, claiming medical malpractice upon birth defects in her new-born child, sought to reverse an adverse jury verdict upon claimed juror misconduct. *See id.* at 740. The plaintiff alleged that one of the jurors, an individual with medical expertise, had argued to her fellow jurors that plaintiff's medical records, which had been admitted into evidence, indicated a viral infection. *See id.* at 742. The plaintiff further alleged that this juror stated during deliberations her opinion that this infection, rather than any malpractice, is what likely caused the subject birth defects. *See id.* The Washington Court of Appeals found no misconduct, stating:

> The evidence of a viral infection at the 16– to 20–week stage of the pregnancy was before the jury from the testimony of one of the doctors and in the medical reports. Juror Geisler's background was known to the parties at the time of voir dire and her "medical" knowledge was something she naturally brought in with her to the deliberations, and this was known by all the parties after voir dire. The medical records were introduced into evidence and sent to the jury room with the jury for its use in the deliberations. There was no extrinsic evidence brought into the case and thus there was no misconduct.

*Id.* at 743. Implicit in this conclusion, the court considered the juror's disclosed and knowingly-accepted specialized knowledge to be intrinsic to the process.

{89} In the present case, Defendant knew of Juror No. 7's training and background, "something [he] naturally brought in with [him] to the deliberations." *Id.* Furthermore, Dr. Watts' testimony—that is, his testimony adduced on both direct and cross-

examinations—was before the jury. The probability of events occurring as Defendant posited was fundamental to the case; evidence upon it had been admitted and amply argued. *See State v. Chamberlain*, 112 N.M. 723, 733, 819 P.2d 673, 683 (1991) (concluding juror experiment with evidence was not improper when "the background information was all properly before the jury"). Upon this record, the district court did not abuse its discretion in concluding that Juror No. 7's training and profession did not constitute an extrinsic influence upon the deliberative process.

{90} As the Supreme Court of California has recognized, "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial." *In re Malone*, 12 Cal.4th 935, 50 Cal.Rptr.2d 281, 911 P.2d 468, 486 (1996); *accord Titus v. State*, 963 P.2d 258, 262 (Alaska 1998) ("[J]urors can make intelligent decisions only by drawing upon their accumulated background knowledge and experience." (Internal quotation marks omitted)); *State v. Dascenzo*, 30 N.M. 34, 37, 226 P. 1099, 1100 (1924) ("In deciding every case, jurors must necessarily take into consideration their knowledge and impressions founded upon experience in their everyday walks of life, and the fact that these things affect them in reaching their verdict cannot be reversible error.").

{91} Similarly, we have consistently held that jurors are expected to rely upon their life experiences and background during deliberations. *See, e.g., Chamberlain*, 112 N.M. at 732, 819 P.2d at 682 ("[T]he jury must be allowed latitude to evaluate evidence and to use its experience to deliberate."). "Specialized knowledge"—of which professional training and educational background are certainly species—is a form of "life experience" and "background." *See In re Malone*, 50 Cal.Rptr.2d 281, 911 P.2d at 486 ("Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work."); *cf. Titus*, 963 P.2d at 262–64 (noting "familiarity with x-ray technology" as a type of general knowledge and discussing

distinction between general and specific knowledge); *Wagner v. Doulton*, 112 Cal. App.3d 945, 169 Cal.Rptr. 550, 552 (1980) (concluding engineer-juror's taking it upon himself to draft diagram based upon evidence at trial did not introduce extrinsic influence upon deliberations).

{92} Furthermore, we believe that to hold otherwise—that is, to regulate separately the participation of jurors with specialized knowledge—would result in an unprecedented and unnecessary intrusion upon the deliberative process of juries, a curtailment of the constitutional right and duty every citizen has to serve on a jury, and establish a rule that would be nearly impossible to enforce without pro forma, post-verdict inquiry into the substance of each jury's deliberations. *Cf. Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting) ("[I]t is an impossible standard to require that tribunal to be a laboratory, completely sterilized and freed from external factors."); *Dascenzo*, 30 N.M. at 37, 226 P. at 1100 ("[J]urors without possessing such knowledge and impressions could not be had."). We see no purpose served by such a formulaic "dumbing down" of our juries, that is, by treating as inherently suspect a juror's known possession of professional knowledge. *See* Robert D. Myers, *Complex Scientific Evidence and the Jury*, Judicature, Nov.-Dec.1999, at 150, 154 ("[L]awyers who believe in 'dumbing down' juries should . . . recognize the important role of jurors as fact finders and decision makers.").

{93} Rather than relying solely upon an individual juror's professional status or training, courts have found misconduct only upon a showing that something extra-record corrupted jury deliberations, that is, the introduction of extrajudicial facts, authority, or issues. For example, in *State v. Thacker*, 95 Nev. 500, 596 P.2d 508, 508 (1979) (per curiam), relied upon by our Supreme Court in *Sacoman* and by Defendant in this case, two defendants appealed their convictions for grand larceny of two calves and were granted, upon their initial motion, a new trial. *See id.* at 509. Their theory of defense was essentially one of mistaken identification; that is, they argued that the cattle the au-

thorities had seized from them were not the animals that had been stolen. *See id.* To support this contention, they argued that the seized cattle were smaller than the stolen cattle. The trial court admitted several photographs into evidence related to this point and permitted the jury to examine the impounded cattle. *See id.* No evidence, however, was "presented at trial concerning the weight of the cattle or what the animals had been fed during the impound." *Id.* After the jury convicted, the defendants alleged juror misconduct.

{94} As it turned out, one of the jurors—indeed, the jury foreman—was the "superintendent in charge of cattle operations at Nevada Nile Ranch," the facility where the allegedly stolen calves had been impounded upon their recovery. *Id.* This cattleman-juror, despite the lack of evidence on the subject, took it upon himself, in reliance upon his knowledge of livestock and feed, to "compute[ ] an estimate of what he thought the calves weighed . . . and gave his information to the other jurors." *Id.* Upon this introduction of fact not in evidence, the Supreme Court of Nevada affirmed the trial court's order granting a new trial.

{95} This holding is consistent with the Supreme Court of California's opinion in *In re Malone,* noted above. Therein, the court denied the habeas corpus petition of a defendant convicted and sentenced to death, in part upon polygraph evidence, on a charge of first-degree murder. *See In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 472–74. The defendant alleged juror misconduct in light of the fact that one of the jurors, a professional psychologist, had argued to the other jurors as to the reliability of polygraph testing generally and as to the adequacy of the administration of the polygraph test specifically at issue. The court stated in this regard:

It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources.

*In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 486.

{96} Applying this general rule, the court held that the psychologist-juror had committed misconduct, albeit without prejudice. Despite some of the California Supreme Court's broad language, a closer reading of the case demonstrates, as in *Thacker,* that it was not merely the psychologist-juror's specialized training that gave the court pause—indeed, she admitted to her fellow jurors as to not being "an expert on polygraphs." *Id.* at 476. Instead, it was the fact that she had specifically based her opinion "on her readings" and on "professional articles on the subject," that is, sources of authority not in evidence. *Id.* at 476, 486.

{97} This is perhaps a fine line to draw, but the distinction is nonetheless critical: The California court premised its conclusion of juror misconduct upon the psychologist-juror's telling of her "fellow jurors [that] her professional reading and course work made her doubt" the testimony presented at trial, *id.* at 475, that is, that the psychologist-juror "told the other jurors [her] beliefs were based on her readings," not the evidence adduced at trial, *id.* at 476. It was this communicated invocation of "specialized information obtained from outside sources" that the court held to cross the line between appropriate and inappropriate juror conduct. *Id.* at 486; *accord McDonald v. Southern Pac. Transp. Co.,* 71 Cal.App.4th 256, 83 Cal.Rptr.2d 734, 738 (Ct.App.1999) (reversing upon railwayman-juror's introduction and expansive discussion of the issue of "sensors," regarding which there had been no evidence presented or argument made at trial).

{98} These cases reinforce our conclusion that it is not merely a juror's possession of or reliance upon his or her education or professional training that is improper. *See In re Malone,* 911 P.2d at 476, 486. Instead, it is misconduct for a juror to invoke his or her expertise with the effect of introducing an extrajudicial influence, be it an extra-record fact, *see Thacker,* 596 P.2d at

509, source of authority, *see In re Malone,* 911 P.2d at 476, 486, or issue, *see McDonald,* 83 Cal.Rptr.2d at 738.

## 2. *Juror No. 7's statements during deliberation.*

{99} Turning to the facts before us: Juror No. 7 is a professional engineer who possesses pre-existing, technical knowledge of a general nature; he disclosed this background on voir dire and Defendant did not object to his impanelment; Juror No. 7 relied upon his professional background in formulating his subjective take on the evidence presented at trial; he shared his opinions with his fellow jurors, a presentation which his fellow jurors, not this Court, characterized as an expression of his "life experience," as "common sense," as "explaining his point of view on the testimony of Dr. Watts," as "on like a kindergartner level". In so sharing his view of the evidence, he specifically discussed the expert testimony at trial; and finally, in so examining this testimony, he noted, as emphasized by the State during its cross-examination of Dr. Watts, the questions he felt it had failed to address and what he felt to be the lack of any "logical tie" between it and Defendant's theory of defense.

{100} The record does not indicate that: Juror No. 7 referred to or relied upon any articles or extra-record authority in support of his view of the evidence; he brought into the jury room any physical object—be it notes or models—with which to assist in his presentation; he performed any "experiments" outside the jury room; he possessed any specific, pre-existing knowledge of the case he was to judge; or he introduced any fact to the jury's deliberations that was extrinsic to the record.

{101} Upon this record, we do not agree with Defendant that Juror No. 7 acted improperly by: (a) expressing his "professional opinion" as to Dr. Watts' expert testimony; (b) voicing his opinion as to what he felt were the limitations of Dr. Watts' testimony, that is, that he felt counsel "didn't ask the right questions"; and (c) offering a "formal presentation" to his fellow jurors that illustrated his subjective view of the evidence at trial. Instead, we conclude that the rec-

ord supports the district court's ruling that no extraneous material corrupted the jury's deliberations.

{102} First, it was not improper for Juror No. 7 to have expressed his "professional opinion." As we have discussed, Juror No. 7 did not act improperly by bringing his profession and training into the jury room. *See In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 486; *cf. Chamberlain,* 112 N.M. at 732, 819 P.2d at 682. This is especially the case as Defendant knew of his profession and training on voir dire. *See Richards,* 796 P.2d at 743. Moreover, upon our review of the applicable law and the record before us, Juror No. 7's expression of his "professional opinion" appears to have been nothing more than the expression of his subjective take on the evidence in record. As his fellow jurors stated to the district court judge during the in camera interviews, Juror No. 7 did little more than express his opinion based on his "life experience"; indeed, despite Defendant's characterization of the record, it indicates that Juror No. 7 presented this opinion "on like a kindergartner level."

{103} Second, it was not improper for Juror No. 7 to have expressed what he felt were the questions Dr. Watts' testimony did not answer. In this regard, Juror No. 7 is guilty only of recognizing and sharing his view of the deficiencies and logical missteps of Defendant's presentation, much like Juror No. 9 did in noting the absence of any facial trauma to Noel after his alleged fall. Moreover, Juror No. 7 did not suggest deficiencies in Defendant's case out of whole cloth: His comments paralleled the questions the State asked Dr. Watts on cross-examination. A jury's recognition and discussion of the strengths and weaknesses of the cases presented at trial is not misconduct. *See Chamberlain,* 112 N.M. at 732, 819 P.2d at 682 ("The jury is not bound by expert opinion."). It is its function. *See id.* at 733, 819 P.2d at 683 ("The jury was required to evaluate these conflicting versions of the truth, and it properly used the evidence before it to perform its duty."); *cf.* Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum. L.Rev. 1197, 1237 (1980) ("The

major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny.").

{104} Taking this view, we do not agree with Defendant that Juror No. 7 acted as an unsworn witness, offering unchallenged expert testimony for the jury's consideration. *See McMann,* 435 F.2d at 818 ("The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice."). Instead, the record supports a conclusion that Juror No. 7 offered no new facts, *see Thacker,* 596 P.2d at 509; that he relied only upon his subjective view of the evidence and no outside authority, *see In re Malone,* 50 Cal.Rptr.2d 281, 911 P.2d at 476, 486; and that he introduced no subject to the deliberations that had not already been fully argued at trial, *see Thacker,* 596 P.2d at 509; *McDonald,* 83 Cal.Rptr.2d at 738.

{105} Similarly, the record supports a conclusion Juror No. 7 committed no misconduct in sharing his opinion and observation by means of a "formal presentation" complete with "calculations" drawn upon a court-provided dry-erase board. *Cf. McMann,* 435 F.2d at 817 ("To resort to the metaphor that the moment a juror passes a fraction of an inch beyond the record evidence he becomes 'an unsworn witness' is to ignore centuries of history and assume an answer rather than to provide the basis for one."). Simply, it is not the medium of his argument that matters; it is its substance.

{106} Juror No. 7's presentation of calculations based upon the evidence at trial was, at most, akin to juror experimentation. As a general matter, while juror experimentation is improper, juror experimentation with evidence is not, per se, misconduct. *See Chamberlain,* 112 N.M. at 732, 819 P.2d at 682 (holding jury experimentation with admitted evidence not to be misconduct despite experimentation expanding upon issues raised at

trial); *see generally* Carroll J. Miller, Annotation, *Propriety Of Juror's Tests Or Experiments In Jury Room,* 31 A.L.R.4th 566 (1984). "The salient question is whether the experiment or investigation made by the jury ... can be said to be within the scope or purview of the evidence introduced at the trial, or whether it amounts to the taking of evidence outside the presence of the parties." *Taylor v. REO Motors, Inc.,* 275 F.2d 699, 705 (10th Cir.1960). Defendant has adduced no evidence corroborating his claim that Juror No. 7 strayed beyond "the scope or purview of the evidence." *Id.*

{107} In short, Juror No. 7 engaged in rigorous scrutiny of trial testimony and articulate juror argument—argument informed by his particular and known professional training and life experience. Juror argument, no matter how persuasive or weighty, is not, in and of itself, misconduct. *See, e.g., Ertsgaard v. Beard,* 310 Or. 486, 800 P.2d 759, 766 (1990) ("In the relatively few cases in which this court has either permitted or required a new trial for juror misconduct that occurred during the deliberating process, we have found none in which the misconduct consisted solely of juror argument."); *cf.* Jay M. Zitter, Annotation, *Impeachment Of Verdict By Juror's Evidence That He Was Coerced Or Intimidated By Fellow Juror,* 39 A.L.R.4th 800, §§ 4, 6(b), 7 (1985) (noting cases where intrajuror intimidation and coercion have been deemed intrinsic to the deliberative process). We therefore conclude, based on all of these considerations, that the allegations of juror misconduct in the present case do not rise to the level of reversible error, as that threshold is suggested by decisions of our Supreme Court. *Compare Chamberlain,* 112 N.M. at 732, 819 P.2d at 682 (determining no misconduct had occurred despite juror experiments that arguably went beyond issues raised at trial) *with Duran,* 99 N.M. at 248, 656 P.2d at 911 (concluding independent extrajudicial experiments conducted by a subset of the jury outside of the jury room *"may* constitute extraneous evidence" (emphasis added)).

{108} We agree with our dissenting colleague that the juror misconduct question

presented turns largely upon a judgment call. The extraneousness of any influence upon a jury's deliberations is inherently a fact-bound question, a question upon which the district court—as having presided over the presentation of all evidence and argument—is ideally situated to rule in the first instance. We conclude on the record presented that the district court did not act contrary to logic and reason in ruling that the jury based its verdict solely upon the evidence adduced at trial and their own, individual consciences. In light of this holding, we need not reach the second prong of the analysis that addresses the possibility of prejudice to the Defendant.

## CONCLUSION

{109} The district court did not abuse its discretion in denying Defendant's motion for a new trial. The denial of Defendant's motion for a new trial is affirmed.

{110} **IT IS SO ORDERED.**

WECHSLER, J., concurs.